# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MINNESOTA

FOND DU LAC BAND OF LAKE )
SUPERIOR CHIPPEWA, )
1720 Big Lake Road )
Cloquet, MN 55720 )
)
              Plaintiff, )
    v. )       Case No. 19-2489
)
CATHY     STEPP,    Regional  5 )
Administrator—Environmental Protection )
Agency;    ANDREW    WHEELER, )
Administrator  of  the  Environmental )
Protection Agency; and UNITED STATES )
ENVIRONMENTAL      PROTECTION )
AGENCY, )
1200 Pennsylvania Ave. N.W. )
Washington, DC 20004, )
)
and )
)
SAMUEL L. CALKINS, District Engineer, )
St. Paul District, U.S. Army Corps of )
Engineers; RYAN D. MCCARTHY, Acting )
Secretary of the Army; U.S. ARMY CORPS )
OF ENGINEERS, )
441 G Street N.W. )
Washington, D.C. 20314,

              Defendants.

_____

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

    Plaintiff, the Fond du Lac Band of Lake Superior Chippewa ("Band" or "Fond du Lac

Band"), complains and alleges as follows:

## I.      INTRODUCTION

1.      This is an action to enforce the requirements of the Clean Water Act ("CWA") with regard to the proposed development of an extensive open-pit copper-nickel-platinum mine ("NorthMet Mining Project" or "Mining Project"), which is the first of its kind in northern Minnesota to be developed by PolyMet Mining, Inc. ("PolyMet").  The mine, if developed, will destroy a large intact area of pristine wetlands, operate for 20 years, and require wastewater treatment both during the mine's operation as well as perpetually after the mine closes.  The Fond du Lac Band brings this action because the proposed mine, as currently permitted, will be a source of pollution in northern Minnesota in perpetuity, creating an existential threat to the Band and its members who occupy a Reservation approximately 70 miles directly downstream from the proposed mine and who hold Treaty-reserved rights to hunt, fish, and gather natural resources both within and outside the Reservation, including within the area that will be affected by the mine.  Despite their obligations to ensure compliance with federal law, both the U.S. Environmental Protection Agency ("EPA") and the U.S. Army Corps of Engineers ("Corps") violated their duties to ensure the permits for the Mining Project comply with the CWA, and failed to protect the Band's Treaty-reserved rights both within and outside the Fond du Lac Reservation from the NorthMet Mining Project.

2.      The Band is a federally recognized Indian tribe and member band of the Minnesota Chippewa Tribe.  The Band occupies a small reservation in northeastern Minnesota – part of a much larger extent of the Chippewa's (Ojibwe's) aboriginal territory which extended through much of present-day Minnesota, Wisconsin, and Michigan.  The Fond du Lac Reservation ("Reservation") was established as the Band's permanent home by the 1854 Treaty of LaPointe, 10 Stat. 1109 ("1854 Treaty").

3.      In the 1854 Treaty, the Band reserved hunting, fishing, and other usufructuary rights in lands ceded under the Treaty ("1854 Ceded Territory").  This Court has affirmed the Band's Treaty rights in the 1854 Ceded Territory.  Today, the Band's members exercise these rights throughout the 1854 Ceded Territory, and the exercise of these rights depends on uncontaminated natural resources.  Both within the Reservation and the 1854 Ceded Territory, the Band has as an active role in natural resource management.

4.      In 1996, the Band achieved Treatment as a State status for purposes of the CWA, 33 U.S.C. § 1377(e).  In other words, the Band is a "State" for purposes of the CWA.  The Band administers a water quality program to protect waters within the Reservation's boundaries.  In 2001, EPA approved the Band's water quality standards, a first for an Indian tribe in the Great Lakes Basin.  Since then the Band has implemented its water quality monitoring program for Reservation lakes and streams.  These efforts have confirmed that Reservation lakes and streams are attaining the Band's water quality standards, with the exception of mercury, which is of particular concern to the Band because mercury accumulates in fish and the Band's members rely on fish for subsistence and cultural practices.

5.      The St. Louis River watershed (called *Chi-gamii-ziibi* in Ojibwe) has been home to the Band for centuries.  Over time, with the development of non-Indian economies in the watershed, the Band has seen its wild rice waters (called *manoomin* in Ojibwe) degraded; its lake sturgeon wiped out by overfishing, habitat degradation, and pollution; and the remaining fish are now so high in mercury that the Band cannot safely feed them to their children.  Despite these impacts, the Band continues to work hard and exercises its authorities to restore and protect its waters and Treaty resources for future generations.

6.      PolyMet, a corporation whose majority shareholder is Glencore, a Swiss-based mining company, proposes to construct and operate the NorthMet Mining Project.  Many of PolyMet's mining and reclamation plans for an open pit mine are still unfinished or tentative, despite the issuance of all necessary permits to begin construction.  The mine will destroy a large intact area of pristine wetlands, have a permanent reactive waste rock stockpile, a tailings basin built on top of an old existing tailings basin that currently contaminates ground and surface water, and a pit lake requiring water treatment in perpetuity.

7.      This action concerns two permits for the Mining Project that were issued to PolyMet pursuant to the CWA, 33 U.S.C. §§ 1251-1388.

8.      The first permit is one to discharge pollutants under the National Pollutant Discharge Elimination System ("NPDES Permit"), 33 U.S.C. § 1342.  On information and belief, the NPDES Permit was issued to PolyMet by the Minnesota Pollution Control Agency ("MPCA") after EPA political appointees, including but not limited to EPA's Region 5 Regional Administrator Cathy Stepp, suppressed the comments and concerns of experienced career staff at EPA Region 5 regarding the NPDES Permit in violation of the Administrative Procedure Act.  The suppressed comments and concerns of the experienced EPA career staff set out reasons why the NPDES permit did not comply with the CWA including, *inter alia,* its failure to ensure the Mining Project would meet applicable water quality standards.  The Band seeks to remedy these violations of law by having this Court order EPA to reconsider its decision not to object to the NPDES Permit and conduct a lawful review of the NPDES Permit based on the proper legal and factual considerations.

9.      The second permit is one to discharge dredged and fill material into navigable waters under Section 404 of the CWA ("404 Permit"), 33 U.S.C. § 1344.  The 404 Permit was

issued to PolyMet by the Corps, without providing the Band a hearing on its objections to the 404

Permit under Section 401(a)(2) of the CWA, 33 U.S.C. § 1341(a)(2).  Under Section 401(a)(2),

the Band had a right to a hearing prior to permit issuance to ensure the 404 Permit complied with

the Band's downstream water quality standards.  Although the Band requested this hearing, no

such hearing was provided to the Band.  Further, on information and belief, political appointees

within EPA, including but not limited to Defendant Stepp, did not allow career staff at EPA Region

5 to inform the Corps of the deficiencies in the NPDES Permit and 401 Certification and prevented

the Band from being heard on its objections to the 404 Permit pursuant to Section 401(a)(2).  The

Corps relied on and incorporated the terms of the deficient NPDES Permit and 401 Certification

in its decision on the 404 Permit.

10.     In issuing the 404 Permit, the Corps also violated the National Environmental

Policy Act, 42 U.S.C. § 4321 *et seq.*, ("NEPA") by, *inter alia*, ignoring the Band's special

expertise, as cooperating agency, including environmental analyses offered throughout the Mining

Project's environmental review under NEPA.  The Corps compounded this error by instead relying

on erroneous data and analyses developed primarily by the applicant for the permit – PolyMet and

its contractors.  The NEPA review was concluded in November 2015 with the release of a 2015

Final Environmental Impact Statement ("FEIS"), which the Corps then relied on for its decision

on the 404 Permit issued on March 21, 2019.

11.     The Corps, in its decision to issue the 404 Permit, also failed to properly apply the

statutory and regulatory criteria required to issue a dredge and fill permit under Section 404 of the

CWA, 33 U.S.C. §§ 1311(a); 1344; 40 C.F.R. pt. 230, as well as the Corps' regulations for

evaluating and determining the public interest, 33 C.F.R. pt. 320.  The Mining Project is not the

least environmentally damaging practicable alternative; will have an unacceptable adverse effect

on municipal water supplies, fishery areas and wildlife habitat; will cause or contribute to significant degradation of waters of the United States and violations of water quality standards; is not in the public interest; and fails to ensure that the Mining Project will comply with the downstream water quality standards established by the Band.

12.     Both the FEIS and the Corps' decision on the 404 Permit are contrary to law, arbitrary and capricious, an abuse of discretion, and in derogation of the federal government's Treaty and trust obligations to the Band.

13.     Accordingly, the Band brings this action for declaratory and injunctive relief.

## II.     JURISDICTION AND VENUE

14.     This Court has subject matter jurisdiction over this action under 28 U.S.C. §§ 1331, 1362, 2201, and 2202.  This action also states claims under the Administrative Procedure Act, 5 U.S.C. §§ 701-706 ("APA"), which waives the United States' sovereign immunity for actions brought under the APA, *id.* § 702, and authorizes a federal court to "compel agency action unlawfully withheld or unreasonably delayed" and to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," *id.* § 706.

15.     Venue is proper in the District of Minnesota under 28 U.S.C. § 1391(b), because Defendants' actions relate to the NorthMet Mining Project, which is located within this district and it is where "a substantial part of the events or omissions giving rise to the claim[s] occurred."

## III.     PARTIES

16.     The Band is a federally recognized Indian tribe and a member band of the Minnesota Chippewa Tribe.  84 Fed. Reg. 1,200, 1,202 (Feb. 1, 2019).  The Band's governing

body is the Reservation Business Committee ("RBC").  The Band's Reservation lies in the St. Louis River basin, approximately 70 miles directly downstream from the Mining Project.

17.     Defendant Cathy Stepp is Regional Administrator of Region 5 of the U.S. Environmental Protection Agency and is sued in her official capacity.

18.     Defendant Andrew Wheeler is the Administrator of the U.S. Environmental Protection Agency and is sued in his official capacity.

19.     The U.S. Environmental Protection Agency ("EPA") is an agency of the United States government which is charged with oversight of permitting programs under §§ 401, 402, and 404 of the CWA, 33 U.S.C. §§ 1341, 1342, 1344.

20.     Defendant Samuel L. Calkins is the District Engineer for the St. Paul District of the U.S. Army Corps of Engineers and is sued in his official capacity.

21.     Defendant Ryan D. McCarthy is the Acting Secretary of the Army and is sued in his official capacity.

22.     The U.S. Army Corps of Engineers ("Corps") is an agency of the United States government which is charged with issuing dredge and fill permits under § 404 of the CWA, 33 U.S.C. § 1344.

### IV.     LEGAL BACKGROUND

#### A.  The Band's 1854 Treaty Rights in the 1854 Ceded Territory.

23.     "A treaty, including one between the United States and an Indian tribe, is essentially a contract between two sovereign nations."  *Washington v. Wash. State Commercial Passenger Fishing Vessel Ass'n*, 443 U.S. 658, 675 (1979).  "In carrying out its treaty obligations with the Indian tribes the Government is something more than a mere contracting party . . . it has charged

itself with moral obligations of the highest responsibility and trust." *Seminole Nation v. United States*, 316 U.S. 286, 296-97 (1942).

24.     A treaty between an Indian tribe and the United States recognizes and guarantees rights existing from time immemorial: the treaty is "a grant of right from" the relevant tribe and "a reservation of those not granted." *United States v. Winans*, 198 U.S. 371, 381 (1905).

25.     Under the Treaty of LaPointe of September 30, 1854, 10 Stat. 1109, ("1854 Treaty") the Band ceded a large portion of land in northeastern and east-central Minnesota ("1854 Ceded Territory"). *Id.* art. 1.  In Article 11 of the 1854 Treaty, the Band reserved "the right to hunt and fish therein . . . ." *Id.*  "As a result of this provision, the Chippewas residing in Minnesota obtained treaty-recognized usufructuary rights on non-reservation lands." *Lac Courte Oreilles Band of Lake Superior Chippewa Indians v. Voigt*, 700 F.2d 341, 363 (7th Cir. 1983).  Article 2 of the 1854 Treaty also established a Reservation as the Band's permanent home, which remains the Band's Reservation to this day.

26.     This Court has affirmed the Band's usufructuary rights in the 1854 Ceded Territory reserved under the 1854 Treaty. *Fond du Lac Band of Chippewa Indians v. Carlson*, No. 5-92-159, slip op. at 55 (D. Minn. Mar. 18, 1996) ("*Carlson*").  This Court affirmed that, "under Article 11 of the Treaty of September 30, 1854, 10 Stat. 1109, the Fond du Lac Band of Lake Superior Chippewa reserved and continues to hold usufructuary rights in the territory ceded under the 1854 Treaty . . . ." *See* Stipulation at 2, *Carlson*, No. 5-92-159 (D. Minn. May 17, 1996) (attached as Exhibit A).

27.     The Band's exercise of its 1854 Treaty rights requires natural resources that are not contaminated. *See Michigan v. U.S. EPA*, 581 F.3d 524, 525 (7th Cir. 2009) (recognizing that a

tribe's "cultural and religious traditions . . . require the use of pure natural resources derived from a clean environment").

28.     Federal agencies have the duty to consider and protect treaty rights in making decisions.  *E.g.*, *Nw. Sea Farms, Inc. v. U.S. Army Corps of Eng'rs*, 931 F. Supp. 1515, 1519-20 (W.D. Wash. 1996) (citing *Seminole Nation*, 316 U.S. at 296-97).

### B.   The National Environmental Policy Act.

29.     NEPA, 42 U.S.C. §§ 4321-4370m-12, is our "basic national charter for protection of the environment."  40 C.F.R. § 1500.1(a).  It makes environmental protection a part of the mandate of every federal agency.  42 U.S.C. § 4332(2).  NEPA requires federal agencies to take a "hard look" at environmental concerns of a federal action.  To that end, NEPA is intended to ensure that an agency, "in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental impacts . . . ."  *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989).

30.     NEPA requires an agency to fully disclose all potential adverse environmental impacts of its action before deciding to proceed.  42 U.S.C. § 4332(2)(C).  NEPA also requires an agency to use high quality, accurate scientific information.  40 C.F.R. § 1500.1(b).

31.     A federal agency is required to prepare an environmental impact statement ("EIS") for a major federal action significantly affecting the quality of the human environment.  *Id.* § 1502.3.  An EIS must have an appropriate scope, which consists of the range of actions, alternatives, and impacts to be considered in the EIS.  *Id.* §§ 1501.7, 1508.25.  In particular, the EIS must consider direct and indirect effects.  *Id.* §§ 1508.25(c), 1508.8.  The direct effects of an action are those effects "which are caused by the action and occur at the same time and place." *Id.* § 1508.8(a).  The indirect effects of an action are those effects "which are caused by the action and

are later in time or farther removed in distance, but are still reasonably foreseeable." *Id.* § 1508.8(b).

32.     An EIS must also analyze the cumulative impacts/effects of a proposed project. *Id.* § 1508.25(c)(3). Cumulative impacts are the result of any past, present, or reasonably foreseeable future actions. *Id.* § 1508.7. Such effects "can result from individually minor but collectively significant actions taking place over a period of time." *Id.*

33.     If more than one federal agency is involved in a group of actions directly related to each other, a lead agency or joint lead agencies are designated to "supervise the preparation of an environmental impact statement . . . ." *Id.* § 1501.5(a), (b).

34.     A cooperating agency is an agency other than a lead agency which "has jurisdiction by law or special expertise with respect to any environmental impact involved in a . . . major Federal action significantly affecting the quality of the human environment." *Id.* § 1508.5. An Indian tribe and a lead agency may agree for the Indian tribe to become a cooperating agency in the NEPA process. *Id.*

35.     A lead agency has the duty and responsibility to "[r]equest the participation of each cooperating agency in the NEPA process at the earliest possible time" and to "[u]se the environmental analysis and proposals of cooperating agencies with jurisdiction by law or special expertise, to the maximum extent possible consistent with its responsibility as lead agency." *Id.* § 1501.6(a)(1), (2).

36.     "If the lead agency leaves out a significant issue or ignores the advice and expertise of the cooperating agency, the EIS may be found later to be inadequate." Forty Most Asked Questions Concerning CEQ's National Policy Act Regulations, 46 Fed. Reg. 18,026, 18,030 (Mar. 21, 1981) (Answer 14b).

### C. The Clean Water Act.

37.     Congress enacted the CWA "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters."  33 U.S.C. § 1251(a).  The CWA prohibits the discharge of any pollutant, including dredged or fill material, into navigable waters unless authorized by a CWA permit.  *Id.* §§ 1311(a), 1344.

#### 1. National Pollutant Discharge Elimination System Permits.

38.     The State of Minnesota exercises delegated federal authority under EPA's oversight to issue NPDES permits for discharges into Minnesota's waters.  *See id.* § 1342(b).  The Minnesota Pollution Control Agency ("MPCA") is the state agency charged with administering Minnesota's NPDES permit program and issuing NPDES permits.  Minn. Stat. § 115.03.

39.     Minnesota's NPDES permit program must comply with the CWA and EPA's regulations for NPDES permits.  *See* 33 U.S.C. § 1342(b); 40 C.F.R. § 123.25(a).

40.     EPA exercises oversight authority over NPDES permits issued by MPCA.  33 U.S.C. § 1342(d).  Because EPA has ultimate responsibility and oversight of NPDES permitting, the EPA has the authority to object to MPCA's issuance of an NPDES permit "as being outside the guidelines and requirements" of the CWA.  *Id.* § 1342(d)(2)(B).  If EPA objects, "[n]o permit shall issue."  *Id*. § 1342(d)(2).  EPA may also assume permitting authority from MPCA and issue the permit "in accordance with the guidelines and requirements" of the CWA.  *Id.* § 1342(d)(4), (a); *see also id.* § 1342(c).

41.     EPA and MPCA have entered into a Memorandum of Agreement to govern the manner in which EPA will oversee MPCA's NPDES permitting.  See Mem. of Agreement Between U.S. EPA & MPCA for Approval of State NPDES Permit Program (May 7, 1974), *available at*  https://www.epa.gov/sites/production/files/2013-09/documents/mn-moa-npdes.pdf

("MOA").  This process is also governed by regulations promulgated by EPA for its "review of and objections to State permits."  40 C.F.R. § 123.44.  EPA must review a State-issued NPDES permit for "[d]ischarges which may affect the waters of a State other than the one in which the discharge originates . . . ."  *Id.* § 123.24(d)(2).

42.     Under the CWA's requirements for NPDES permitting, "[n]o permit may be issued . . . [w]hen the imposition of conditions cannot ensure compliance with the applicable water quality requirements of all affected States . . . ."  *Id.* § 122.4(d).  The term "affected States" includes Indian tribes, like the Band, that have achieved Treatment as a State ("TAS") status under the CWA.  33 U.S.C. § 1377(e).

43.     In addition, "[n]o permit may be issued . . . [t]o a new source or a new discharger, if the discharge from its construction or operation will cause or contribute to the violation of water quality standards."  40 C.F.R. § 122.4(i).

44.     Under the CWA, effluent limitations on point source discharges are a means of ensuring compliance with water quality standards and achieving the objectives of the CWA.  33 U.S.C. § 1311(b).  The CWA provides for two types of effluent limitations to control and ensure point source discharges' compliance with water quality standards: technology-based effluent limitations ("TBELs") and water quality-based effluent limitations ("WQBELs").  *Id.* § 1311(b)(1)(A), (b)(1)(C).

45.     TBELs are industry-wide effluent limitations that represent the best practicable control technology currently available.  *Id.* § 1311(b)(1)(A)(i).  An NPDES permit includes TBELs without regard to any impact on the water quality of the waters receiving the discharge.  *See Weyerhaeuser Co. v. Costle*, 590 F.2d 1011, 1042 (D.C. Cir. 1978).

46.     "When [TBELs] would fall short of achieving desired water quality levels," an NPDES permit includes "additional, more stringent [WQBELs] for those particular point sources." *Iowa League of Cities v. EPA*, 711 F.3d 844, 856 (8th Cir. 2013) (citing 33 U.S.C. § 1312(a)). EPA's regulations require NPDES permits to control by WQBELs all pollutants that are determined "are or may be discharged at a level which will cause, have the reasonable potential to cause, or contribute to an excursion above any State water quality standard, including State narrative criteria for water quality." 40 C.F.R. § 122.44(d)(1)(i). If a "discharge causes, has the reasonable potential to cause, or contributes to" an exceedance of a "State water quality standard for an individual pollutant, the permit must contain effluent limits for that pollutant." *Id.* § 122.44(d)(1)(iii).

47.     Compliance with the CWA before a NPDES permit is issued is significant because the CWA also contains a "permit shield," which provides a defense to a permittee from liability and enforcement by EPA, government agencies, and citizens for violations of the CWA, so long as the permittee complies with the terms of its NPDES permit. *See* 33 U.S.C. § 1342(k).

**2. Section 404 Dredge and Fill Permits.**

48.     EPA retains oversight authority over the section 404 permitting program and may veto the Corps' approval of a permit if the dredged or fill material would have "an unacceptable adverse effect on . . . fishery areas . . . , wildlife, or recreational areas." *Id.* § 1344(c); *see Minnesota ex rel. Spannaus v. Hoffman*, 543 F.2d 1198, 1206 n.24 (8th Cir. 1976).

49.     In evaluating an application for a Section 404 permit, the Corps must comply with criteria in 33 C.F.R. part 320, including evaluating the proposed activities for compliance with applicable water quality standards. 33 C.F.R. § 320.4(d).

50.     The Corps' regulations prohibit the issuance of a section 404 permit if "the district engineer determines that it would be contrary to the public interest."  *Id.* § 320.4(a)(1).  The Corps' public interest determination requires the district engineer to weigh the benefits that reasonably may be expected to accrue from the proposal against its reasonably foreseeable detriments, considering all relevant factors.  *Id.*

51.     The Corps must also comply with regulations promulgated in conjunction with EPA for its review of proposed discharges of dredged or fill material into navigable waters of the United States.   33 U.S.C. § 1344(b)(1); 40 C.F.R. §§ 230.1-230.98.   These regulations are commonly referred to as the "404(b)(1) Guidelines."

52.     A fundamental precept of the 404(b)(1) Guidelines is "that dredged or fill material should not be discharged into the aquatic ecosystem, unless it can be demonstrated that such a discharge will not have an unacceptable adverse impact either individually or in combination with known and/or probable impacts of other activities affecting the ecosystems of concern."  40 C.F.R. § 230.1(c).

> From a national perspective, the degradation or destruction of special aquatic sites, such as filling operations in wetlands, is considered to be among the most severe environmental impacts covered by these Guidelines.  The guiding principle should be that degradation or destruction of special sites may represent an irreversible loss of valuable aquatic resources.

*Id.* § 230.1(d).

53.     The 404(b) Guidelines provide, *inter alia*, that no discharge of dredged or fill material may be permitted if: (1) there is a "practicable alternative" that is less damaging to the aquatic ecosystem; (2) the discharge will "cause or contribute to significant degradation" of waters of the United States; or (3) the discharge "[c]auses or contributes, after consideration of disposal site dilution and dispersion, to violations of any applicable State water quality standard . . . ."  *Id.*

§ 230.10(a), (b)(1), (c).  Further, no discharge of dredged or fill material may be permitted "unless appropriate and practicable steps have been taken which will minimize potential adverse impacts of the discharge on the aquatic ecosystem."  *Id.* § 230.10(d).

### 3.   Section 401 Certifications and Objections of a Downstream State.

54.   Section 401(a)(1) of the CWA requires any applicant for a federal permit to conduct any activity "which may result in any discharge into the navigable waters" to obtain a certification "from the State in which the discharge originates or will originate . . . ."  33 U.S.C. § 1341(a)(1) ("401 Certification").  This certification confirms "that any such discharge will comply" with certain provisions of the CWA, including the certifying State's water quality standards.  *Id.* Section 401(a)(1) accordingly gives a certifying State the ability to deny certification or impose conditions on a federal permit to ensure any discharge will comply with the State's water quality standards.  *See PUD No. 1 v. Wash. Dep't of Ecology*, 511 U.S. 700, 711 (1994).

55.   The rights of a State that is located downstream (an "affected State") from the certifying State are provided in Section 401(a)(2) of the CWA.  33 U.S.C. § 1341(a)(2).  Section 401(a)(2) of the CWA "prohibit[s] the issuance of any federal license or permit over the objection of an affected [downstream] State unless compliance with the affected [downstream] State's water quality requirements can be ensured."  *Arkansas v. Oklahoma*, 503 U.S. 91, 103 (1992).

56.   Section 518(e) of the CWA, 33 U.S.C. § 1377(e), expressly authorizes EPA to treat eligible federally recognized Indian tribes, like the Band, in a similar manner as a State for certain programs, including for purposes of Section 401(a)(2) regarding the water quality standards of a downstream State.

57.     Accordingly, EPA must review an application for a federal permit and the accompanying 401 Certification for whether "such a discharge may affect . . . the quality of the waters of any other State," and "shall so notify such other State . . . ." *Id.* § 1341(a)(2).

58.     Upon EPA's notification, the affected downstream State has sixty days to object to the permit and request a hearing on its objections. *Id.* If an affected State objects and requests a hearing, the permitting agency then "shall hold such hearing." *Id.* After considering the recommendations of the Administrator, the affected State, and "any additional evidence" at such hearing, the permitting agency "shall condition . . . [the] permit in such manner as may be necessary to insure compliance with applicable water quality requirements." *Id.* If conditions cannot ensure compliance with the affected State's water quality standards, the permitting agency "shall not issue such . . . permit." *Id.*

## V.     FACTS AND ALLEGATIONS

### A.  The NorthMet Mining Project.

59.     The NorthMet Mining Project would be Minnesota's first copper-nickel-platinum mine. The NorthMet Mining Project would be located within the Band's 1854 Ceded Territory, and would lie approximately 70 miles upstream of the Fond du Lac Reservation.

60.     The NorthMet Mining Project will pollute the Embarrass and Partridge Rivers, which are both headwaters of, and tributaries to the St. Louis River. Waters within the St. Louis, Embarrass, and Partridge Rivers are listed as impaired for certain pollutants under Section 303(d) of the CWA, 33 U.S.C. § 1313(d), such as for mercury in the water column and in fish tissue. A listing as impaired under Section 303(d) of the CWA means, *inter alia*, that the listed water is not meeting water quality criteria for its designated use. The St. Louis River drains into Lake Superior and due, in part, to historical discharges of contaminants from industry, it is one of the 31 U.S.-

based "areas of concern" across the Great Lakes.[1]  EPA's identification of the St. Louis River as an "area of concern" means it is an area within the Great Lakes Basin that has experienced severe environmental degradation, largely due to the impacts of decades of uncontrolled pollution from mining and other industries.

61.     Mining and ore processing for the NorthMet Mining Project will go on for at least 20 years and post-closure maintenance would continue for 200 to 500 or more years – essentially indefinitely.

62.     The primary components of the NorthMet Mining Project are a copper sulfide ore open pit mine ("Mine Site") and a processing plant ("Plant Site"), connected by a network of transportation and utility corridors and water pipelines.  The Mine Site and Plant Site are located approximately eight miles apart.

63.     The Mine Site is 3,016 acres and includes approximately 1,311 acres of pristine, high quality wetlands.  High quality wetlands have low disturbance levels and high vegetative diversity and integrity.  These wetlands cover approximately 43% of the Mine Site.  The Mine Site includes a portion of the area called the One Hundred Mile Swamp at the Partridge River's headwaters, which is designated as a site of high biodiversity significance under Minnesota law.

64.     There is no known existing contamination by hazardous materials at the Mine Site. The Mine Site was previously managed by the U.S. Forest Service as part of the Superior National Forest, until the Forest Service conveyed land within the Mine Site to PolyMet in a 2017 land exchange.

65.     The Corps claims that the Mining Project would directly impact 901.24 acres of wetlands and indirectly impact 26.93 acres of wetlands, though other estimates put the number of

---

[1] U.S. EPA, *St. Louis AOC*, https://www.epa.gov/great-lakes-aocs/st-louis-river-aoc.

impacted acres much higher.  These wetlands are part of a large, contiguous, mixed and connected wetland complex that provides important ecosystem functions to the St. Louis River Watershed, the Lake Superior Watershed, and the Great Lakes Basin, including downstream water quality, flood control, biodiversity and unique, connected habitat for a variety of wildlife, including moose and other species culturally important to the Band.  EPA has also designated wetlands to be impacted at the Mine Site as an aquatic resource of national importance.

66.     PolyMet's dredge and fill activities would result in the largest permitted destruction of wetlands in Minnesota's history.  PolyMet will discharge dredged or fill material into wetlands, which would then either be removed and replaced by mine pits or excavated and replaced with fill material discharged to construct overburden and waste rock storage facilities, roads, storm and mine water management systems, tailings basin buttresses, the tailings basin seepage capture system, and utility corridors.  PolyMet's discharges into wetlands will generate turbidity and suspended particulates that will then be conveyed via overland flow to downstream waters. PolyMet's dredge and fill activities will remove and dewater wetlands that are dominated by peat bogs, which will release and discharge significant amounts of mercury and sulfate into waters of the United States, affecting the Band's downstream waters.

67.     During mining operations, PolyMet will extract 32,000 tons of ore per day.  During 20 years of active mining, PolyMet will create over 300 million tons of waste rock, much of which will be reactive mine waste.  Waste rock will remain at the mine permanently.  The ore and waste rock that would be generated will contain sulfide minerals, which when exposed to oxygen and water can produce acid mine drainage and have devastating effects on natural resources and the environment.  The Mining Project will adversely impact natural resources, including fish, plant

and wildlife habitat, and water quality, through leaching of metals, sulfate, and other pollutants from waste rock and mine facilities into the environment.

68.     At the Plant Site, PolyMet would process ore in a hydrometallurgical plant and produce approximately 313,000 tons of waste residue annually.  These residues would be reactive and include mercury.  PolyMet would deposit them into a hydrometallurgical residue facility located at the Plant Site.

69.     Ore refining would also produce reactive mine wastes called tailings, which would be mixed with water to form a slurry and pumped into a flotation tailings basin ("FTB").  The FTB will be unlined and its design relies on water leaking into the ground or assumes a certain rate of seepage in order to operate.  The FTB would be built on top of an over fifty-year-old existing tailings basin left behind by LTV Steel Mining Company ("LTVSMC"), which still contains taconite ore tailings that are currently contaminating waters and natural resources in the area.  The Plant Site contains legacy contamination from LTVSMC's former iron ore processing facilities for which PolyMet will only be partly responsible.  Cliffs Erie, LLC ("Cliffs Erie") acquired LTVSMC's iron ore processing facilities and has since declared bankruptcy.  Cliffs Erie is a party to a consent decree that requires remediation, reclamation, and closure activities that will address legacy contamination at the Plant Site regardless of whether the Mining Project proceeds.

70.     During the 20 years of mining, PolyMet would deposit approximately 225 million tons of contaminated mine tailings into the FTB that will result in long-term seepage into groundwater and surface water.

71.     At the Plant Site, PolyMet is to operate a Wastewater Treatment System ("WWTS") to treat polluted wastewater from mine processes and collected tailings basin seepage.  As authorized by PolyMet's NPDES Permit, the WWTS will discharge polluted wastewater to surface

water at Unnamed Creek and Trimble Creek, which flow into the Embarrass River, and to Second Creek, which flows into the Partridge River.  After discharge, the polluted wastewater will flow down the Partridge and Embarrass Rivers into the St. Louis River, reaching the Band's waters downstream.  PolyMet expects to start discharging polluted wastewater 24 months after the start of construction.   During operations, PolyMet will continuously discharge on average approximately 2.4 million gallons of polluted wastewater per day (or a maximum of up to 2.9 million gallons per day) from the WWTS.  This amount will increase to an average of 3.9 million gallons of polluted wastewater per day (or a maximum of up to 5.7 million gallons per day), during the tenth year of operations.

72.     Under PolyMet's NPDES Permit, the WWTS is subject to state internal "operating limits," rather than WQBELS under the CWA for relevant pollutants.  These "operating limits" derive from Minnesota's pollution control laws, not the CWA.  PolyMet's NPDES Permit establishes "operating limits" for seven pollutants, including sulfate, copper, arsenic, cobalt, lead, nickel, and mercury.  These "operating limits" are set to the corresponding Minnesota water quality standard, which, for mercury, is 1.3 ng/L.  PolyMet's NPDES Permit also includes TBELs that are up to a thousand times greater than applicable water quality criteria.

73.     Methylmercury is an organic form of mercury that accumulates in fish.  Methylmercury persists and accumulates progressively up the food chain, producing toxic effects to humans and wildlife that consume fish with mercury in fish tissue.  Sulfate can convert inorganic mercury into methylmercury through a process called mercury methylation.  In other words, sulfate plays a role in transforming mercury into methylmercury, which can then be readily accumulated in aquatic species.

74.     Despite the distance between the Mining Project and the St. Louis River, there is no physical or chemical basis to deduct the Mining Project's contributions of methylmercury from the Partridge and Embarrass Rivers to the St. Louis River.  In addition, there are no physical barriers to fish movement between the Partridge and Embarrass Rivers and the St. Louis River. As such, methylmercury will bioaccumulate in fish in the Partridge and Embarrass Rivers and the fish could then freely migrate downstream into the St. Louis River, as well as migrate into other waters within the 1854 Ceded Territory where Band members exercise Treaty fishing rights.

75.     The St. Louis River is the most significant and utilized fishery on the Reservation. Since 2005, water quality data collected by the Band has demonstrated consistent exceedances of the Band's water quality numeric chronic criterion for mercury of 0.77 ng/L.  Fish tissue collected by the Band has shown mercury concentrations that exceed human health risk levels and has required advisories that recommend Band members limit consumption of traditional fish species. The Band's water quality standards also prohibit "further water quality degradation which would interfere with or become injurious to existing or designated uses."

76.     The mining sector is the largest source of mercury within the Lake Superior Basin. Studies by the Band and other experts have shown that a primary source of mercury concentration in fish in the St. Louis River is mining waste from existing mines in the vicinity of the Mining Project.  In addition, a 2011 report from the Minnesota Department of Health found that 1 in 10 newborns tested in the Lake Superior Basin had unsafe concentrations of mercury.

77.     In addition, wild rice is a vital cultural and Treaty resource for the Band.  Wild rice grows best in waters with low sulfate concentrations.  Wild rice waters have been degraded in the Embarrass River and Partridge River watersheds due to inadequate protection of wild rice and failed enforcement of Minnesota's water quality standard for sulfate on the mining industry.  Wild

21

rice is susceptible to sulfate throughout the year, not just in certain seasons. Wild rice beds are also variable and can move from year-to-year to different locations within the same waterbody.

78. To address legacy pollution and environmental degradation, the Band's Environmental Program has implemented a broad-based water quality protection program, which includes federally approved water quality standards, a comprehensive monitoring program to assess Reservation lakes and streams, and protection plans for wetlands and groundwater resources. In 2008, the Reservation Business Committee approved the Band's Integrated Resource Management Plan, which identifies on- and off-reservation resource management priorities to include protecting and improving wild rice harvest; improving in-stream habitat for fishing; preserving traditional hunting, fishing, and gathering rights in the 1854 Ceded Territory; preserving the quality and quantity of wildlife and wildlife habitat in the 1854 Ceded Territory; and vigorous environmental protection.

### B. Environmental review of the NorthMet Mining Project.

79. On July 16, 2004, PolyMet first submitted an application to the Corps for a 404 permit in order to develop the NorthMet Mining Project. Thereafter, the Corps determined that its action on the permit application required the preparation of an EIS pursuant to NEPA, due to the context and intensity of the proposed impacts to waters of the United States.

80. On October 25, 2005, the Corps, in cooperation with the Minnesota Department of Natural Resources ("Co-lead Agencies"), issued its final scoping decision for the Mining Project's EIS. The Corps neither involved nor consulted the Band during scoping or when the final scoping decision was issued.

81. The final scoping decision for the Mining Project required evaluation of project alternatives, including underground mining. For underground mining, the final scoping decision

specified that underground mining could be eliminated only if it were infeasible.  Otherwise, if underground mining merely provided a lower economic return, a detailed assessment must be prepared.

82.     After scoping, the Co-lead Agencies set out to prepare a joint state-federal EIS. The Corps invited the Band to serve as a cooperating agency in the preparation of the EIS based on the Band's regulatory authority and subject matter expertise.  The Band participated as a cooperating agency throughout the preparation of the EISs for the Mining Project

83.     In that role, the Band was assisted by the Great Lakes Indian Fish & Wildlife Commission ("GLIFWC"), an intertribal resource management agency that coordinates with the Band in natural resource monitoring and use within the 1854 Ceded Territory.  The Band was also joined by the Bois Forte Band of Chippewa ("Bois Forte") and the Grand Portage Band of Lake Superior Chippewa ("Grand Portage") as cooperating agencies (collectively, "Tribal Cooperating Agencies").  The Tribal Cooperating Agencies, GLIFWC, and the 1854 Treaty Authority (a natural resource management agency for the Bois Forte and Grand Portage Bands) provided comments, analyses, recommendations, and proposals at each stage of environmental review for the Mining Project, with the exception of the scoping process.  Despite the Band's involvement throughout the NEPA process as a cooperating agency, the Corps ignored the Band's special expertise and analyses, and instead relied on erroneous data and analyses developed primarily by PolyMet and its contractors.

84.     In October 2009, the Corps issued a Draft EIS ("DEIS") for the Mining Project. The Band commented on the DEIS and concluded that the DEIS was inadequate in numerous respects.  In its comments, the Band noted that it had previously identified these deficiencies to the Corps, but the Corps disregarded the Band's recommendations and continued to rely on

23

deficient analyses.  The Band's comments identified several major areas in which the DEIS was deficient  including, *inter alia*, (1) the scoping process; (2) the  analysis of water quality impacts; (3) the analysis of the Mining Project's impacts on wildlife and other Treaty resources; (4) the assessment of indirect impacts to wetlands; (5) the cumulative impact analysis; and (6) the failure to adequately analyze impacts on the 1854 Ceded Territory and the Band's Treaty rights.

85.     On February 18, 2010, EPA Region 5 submitted written comments on the DEIS. EPA Region 5 rated the DEIS as "Environmentally Unsatisfactory – Inadequate," which is EPA's lowest rating for an action's environmental impact, and meant that the Mining Project must not proceed as proposed due to concerns such as the Project's adverse impacts on wetlands; adverse impacts to water quality, including the quality of water governed by the Band's water quality standards; issues related to financial assurance; and the DEIS's failure to analyze the 1854 Ceded Territory as a whole geographic area for its cumulative impacts analysis.

86.     On March 6, 2012, the Band's water quality staff wrote to the Corps to explain the Band's water quality standards and their application to the Mining Project.  In response to the Corps' apparent confusion, the Band's staff clarified the Band's status as a State for purposes of the CWA.  The Band's staff noted EPA approved its water quality standards in 2001 through a process that was "subject to additional scrutiny at EPA Headquarters," as the first Indian tribe to seek approval in the Great Lakes Basin.  The Band also noted it was authorized to exercise authority under Section 401 of the CWA.  The Band explained all elements of its water quality standards, including designated or beneficial uses for waters of the Reservation, narrative and numeric criteria to support or sustain those uses, and antidegradation provisions.  The Band's staff explained that the Band's water quality standards have been established to assume a higher fish consumption rate by Band members than the general public.  This was based on an Ojibwe diet

and traditional practice.  The Band notified the Corps of current exceedances of the Band's water quality standard for mercury in the St. Louis River within the Reservation and asserted that, "if a new proposed project would *cause or contribute to an existing impairment*, it cannot be permitted."

87.    The Corps, along with other Co-lead Agencies, which now included the U.S. Forest Service, proceeded to perform additional analysis for a Supplemental Draft Environmental Impact Statement ("SDEIS").  EPA was also added as a cooperating agency for the NEPA review.  The Band was permitted to review a Preliminary Supplemental Draft Environmental Impact Statement ("PSDEIS"), which was made available to cooperating agencies prior to publication of the SDEIS.

88.    Despite specific and repeated requests from the Tribal Cooperating Agencies, the Corps refused to use an EPA guidance document for evaluating cumulative effects on Treaty resources.  Thus, in September 2013, the Tribal Cooperating Agencies proposed and submitted an alternative cumulative effects analysis for use in the SDEIS, in response to the Corps' refusal to properly consider the Mining Project's cumulative effects on the Band's Treaty resources and cultural and historic sites.  Through experience, the Tribal Cooperating Agencies understood that historic, current, and reasonably foreseeable mining activities have profoundly and, in many cases, permanently degraded vast areas of wetlands, forests, air and water resources, wildlife habitat, cultural sites, and other critical Treaty-protected resources in the 1854 Ceded Territory.  Based on their expertise, the Tribal Cooperating Agencies' alternative cumulative effects analysis sought to address the incompleteness and inadequacy of the Co-lead Agencies' cumulative effects analysis.

89.    The Tribal Cooperating Agencies' alternative cumulative effects analysis evaluated cumulative effects in the St. Louis River watershed, the 1854 Ceded Territory, and the Tribal Historic District (a designated area within the 1854 Ceded Territory of particular cultural importance).

25

90.     For example, the Tribal Cooperating Agencies proposed that the St. Louis River watershed be used for the Mining Project's cumulative effects analysis of water resources.  In support, the Tribal Cooperating Agencies highlighted deficiencies in the Mining Project's water modeling.  The Tribal Cooperating Agencies also showed that there were existing exceedances of water quality standards, which would require WQBELs based on a waste load allocation to be established for the Mining Project.  The Tribal Cooperating Agencies showed the Corps that the Mining Project's additional loading of pollutants to waters that already exceed water quality standards justified an evaluation of cumulative effects for the entire St. Louis River watershed.

91.     The Tribal Cooperating Agencies also justified the St. Louis River watershed as the appropriate scope for evaluating cumulative effects to aquatic species.  In addition to the Partridge and Embarrass Rivers, the Tribal Cooperating Agencies pointed to the fact that there are impaired rivers and streams in the St. Louis River watershed, including impairments related to exceedances of human health criteria for mercury in fish tissue.  These existing impairments make the cumulative effects of the Mining Project greater.

92.     The Tribal Cooperating Agencies' alternative cumulative effects analysis also analyzed sulfate concentrations throughout the St. Louis River watershed in relation to impacts on wild rice.  This analysis showed, *inter alia*, that sulfate concentrations only gradually decrease downstream of mine discharge sites.

93.     The Tribal Cooperating Agencies' alternative cumulative effects analysis also proposed that the No Action Alternative should include modeling with activities that will occur under the Cliffs Erie consent decree.

94.     In November 2013, the Corps issued a Supplemental Draft EIS ("SDEIS") for the Mining Project, attempting to resolve environmental concerns and barriers to permitting raised in response to the DEIS.

95.     After reviewing the SDEIS, the Band found that many of the very substantial problems that the Band had identified in the DEIS and its recommendations for proper study and analysis were disregarded.  The Band submitted extensive detailed comments on the SDEIS identifying the Band's specific concerns, supported by expert analysis and recommendations for proper evaluation of the potential impacts of the Mining Project.  The Band's comments, and those of the other Tribal Cooperating Agencies, emphasized the need to properly examine the impacts of the Mining Project on Treaty protected rights and resources, including, for example, the threat of increased mercury from the Mining Project given the existing levels of mercury in fish at levels that restrict human consumption, which threatens the ability of Band members to exercise their Treaty rights to sustain themselves in the 1854 Ceded Territory and within the Reservation.

96.     EPA also submitted written comments on the SDEIS.  In its comments on the SDEIS, EPA raised many substantive issues that required further analysis.  For example, EPA raised issues regarding the SDEIS's water modeling.  EPA commented on the SDEIS's GoldSim water modeling, which did not model mercury.  EPA recommended that the FEIS should model mercury or otherwise provide a rationale for why modeling mercury is inappropriate.  To model mercury, EPA suggested use of its "Water Quality Analysis Simulation Program," which "is commonly used by EPA to model elemental mercury."

97.     EPA's comments on the SDEIS raised numerous other issues that it suggested be considered in the FEIS, such as: the correction of wetland delineation errors; the need to quantitively assess all indirect impacts to wetlands; environmental justice concerns related to

mercury impacts on the Band's subsistence use of fish; an indication in the FEIS that any discharge not captured by the Mining Project's proposed groundwater capture systems and entering waters of the United States is subject to NPDES permitting; and impacts to moose as a culturally important species to the Band.

98.     In November 2015, the Corps issued a Final EIS ("FEIS") for the Mining Project.

99.     As it had with the DEIS and SDEIS, the Band reviewed and commented on the FEIS and found that it failed to address the deficiencies previously identified by the Band.  The Band again submitted extensive detailed comments on the issues of concern, supported by expert analysis and recommendations on steps for a proper assessment of the Mining Project's impacts. The Band's comments also addressed PolyMet's application for a 404 permit.

100.    The FEIS, like the SDEIS before it, eliminated alternatives that could provide mitigation for or prevent long-term environmental damage.  For example, the FEIS stated that underground mining was eliminated as an alternative to the Proposed Action "because it was found to be economically infeasible" in an analysis from 2013. The Band, as in its comments to the SDEIS, provided information explaining why various alternatives were inappropriately and unreasonably disregarded, such as underground mining and dry-stack tailings.

101.    The FEIS reached conclusions about hydrology and water quality based on models that were not designed for those purposes, were improperly calibrated, or failed to model for significant pollutants.  In particular, the FEIS used a modeling program called MODFLOW for groundwater hydrologic modeling.  To model surface water hydrology, the FEIS used a program called XP-SWMM.  The FEIS used a program called GoldSim to model water quality, with the exception of mercury.  To model mercury, the FEIS used a "simple mass balance" estimation model.

28

102.    The Band commented that the FEIS relied on a hydrology model in MODFLOW that was fundamentally flawed and was inappropriately used for numerous purposes in environmental review.  MODFLOW cannot generate reliable environmental impact predictions because it was calibrated with data from different periods in time.  The Tribal Cooperating Agencies discovered this error after independently reviewing the FEIS's hydrology model, and then corrected the calibration.  When properly calibrated, the model showed that groundwater will flow north from the Mine Site after closure and eventually outflow to Birch Lake and the Boundary Waters Canoe Area Wilderness, which are located in the Rainy River basin.

103.    The Corps acknowledged that the Tribal Cooperating Agencies' analysis was correct, but then discounted the probability of northward flow, based on PolyMet's rationale that it was unlikely due to a groundwater mound that would form and prevent northward flow of groundwater after closure.  The Tribal Cooperating Agencies pointed out that this theory was physically impossible, and requested a technical discussion on this issue, but the Corps flatly refused to do so.  In relying on MODFLOW, the Corps accepted PolyMet's approach, which was inconsistent with accepted modeling methodology and included an unacceptable calibration error.

104.    The FEIS erroneously concluded that there would be an "overall reduction" in mercury loading downstream to the St. Louis River and that the Mining Project would not add to any exceedance of the Band's mercury water quality standard of 0.77 ng/L within the Reservation. As the regulatory authority for water quality within the Reservation, the Band disagreed with this conclusion and the FEIS's approach to evaluating mercury impacts.  In support, the Band cited the analysis of Dr. Brian Branfireun, an internationally recognized expert in hydrology and environmental cycling of mercury, to show that the FEIS relied on flawed data and does not conform to standard practices for data collection and presentation.  Rather than the FEIS's "simple

mass balance" model, Dr. Branfireun had previously suggested other models be used that were more appropriate to model mercury dynamics.

105.   The Band objected to the FEIS's reliance on a mercury mass balance model to predict future conditions.  The Band emphasized that a mass balance model cannot model the input and removal processes for mercury, nor can such a model address aspects of mercury methylation. The Band showed that mine pit and wetland dewatering would increase total mercury, methylmercury, and sulfate in the Partridge River, Embarrass River, and the St. Louis River.  The Band also showed it was highly likely that the lag time for monitoring increases in methylmercury would preclude effective adaptive management prior to irreversible impairment of downstream waters.  In addition, the Mining Project's removal and dewatering of peat dominated wetlands will release and discharge mercury and sulfate into surface waters, affecting the Band's downstream waters.

106.   The FEIS assumed that the Mining Project's WWTS at the Plant Site would be subject to WQBELs that are protective of the Great Lakes Initiative water quality standard for mercury of 1.3 ng/L.  This assumption was incorrect, as the final NPDES Permit does not impose a WQBEL for mercury.

107.   The FEIS proposes monitoring that will be conducted after-the-fact to determine and mitigate indirect wetland impacts.  Throughout the NEPA process, the Band repeatedly challenged the Corps' insistence on future monitoring as the best approach to determining and mitigating indirect wetland impacts.  The Band commented that such an approach is inconsistent with the purpose of an environmental impact statement to be "forward looking" to predict potential impacts and provide adequate mitigation for those impacts.

108.    The Band and GLIFWC advocated for the Corps to use the "Crandon method" to determine indirect wetland impacts.  The Crandon method was previously used by the Corps in reviewing other proposed mines in the region.  The Crandon method uses a detailed delineation of wetlands to obtain accurate wetland classifications, as well as a calibrated groundwater model to support an accurate characterization of groundwater hydrology.  The FEIS's analysis is inadequate as to both of these critical data elements.

109.    First, in September 2010, the Corps, the Co-lead Agencies, the Tribal Cooperating Agencies, EPA, and PolyMet's consultant conducted a site visit and determined that 25% of the wetlands visited were classified incorrectly.  These wetlands also had more connectivity to groundwater than their original classification.

110.    Second, the Corps refused to develop and calibrate a groundwater model so that the Crandon method could be properly implemented, despite a unanimous request from the Wetlands Impact Assessment Workgroup, which consisted of technical staff from the Tribal Cooperating Agencies, the U.S. Fish & Wildlife Service, EPA, the Minnesota Department of Natural Resources ("MDNR"), and MPCA.  The Corps acknowledged that additional field data collection and groundwater modeling was recommended and supported by Wetlands Impact Assessment Workgroup members from the Tribal Cooperating Agencies, U.S. Fish & Wildlife, EPA, and MPCA.  However, the Co-lead Agencies and PolyMet's consultants did not support conducting this analysis.  The Corps acknowledged that the Co-lead Agencies' position was "contrary to standard analysis that mining companies have to conduct as part of sulfide mine EIS processes across the country."

111.    Rather than appropriately apply the Crandon method, the Corps used data from the Canisteo Mine Pit, a mine pit located in a different geologic formation and elevation than the

Mining Project. The Corp also used selective data from the Canisteo Mine Pit that supported its predetermined conclusion that indirect impacts to wetlands would be minor.

112.    Nevertheless, GLIFWC conducted an independent analysis of indirect wetland impacts using more relevant data and submitted it for the SDEIS. GLIFWC's independent analysis showed that a total of 5,719 acres of wetlands will suffer severe indirect impacts from mine pit drawdown. At a minimum, GLIFWC proposed that the Corps require up front mitigation for all severe indirect impacts.

113.    GLIFWC also commented that the XP-SWMM modeling was fatally flawed because it is incapable of predicting current baseflow conditions. GLIFWC highlighted that, if the XP-SWMM model is incapable of predicting current water quantity, it will not accurately predict future water quantity conditions, a much more difficult task. Accordingly, GLIFWC contended that the XP-SWMM model is not suitable to predict future conditions for surface water.

114.    In response to requests by the Tribal Cooperating Agencies, the Co-lead Agencies could not provide a single example of a similar facility that has been able to achieve a 90% or greater seepage capture efficiency. The Band commented that the Co-lead Agencies' assumptions regarding seepage capture efficiencies were unsupported and invalidated the FEIS's analysis related to groundwater contamination and water quality.

115.    In Chapter 8 of the FEIS, the Corps attempts to describe the Tribal Cooperating Agencies' major differences of opinion regarding the SDEIS. The Band commented that Chapter 8 of the FEIS was not updated to reflect major differences of opinion that arose after publication of the SDEIS, including an error in the FEIS's groundwater modeling that the Band and Tribal Cooperating Agencies identified after being provided access to the final hydrologic model. The Band also commented that Chapter 8, which was written by the Co-lead Agencies without the

Tribal Cooperating Agencies' input, mischaracterizes the Bands' positions.  This was a recurring issue and flaw throughout the Mining Project's environmental review, as the Band previously objected to the Co-lead Agencies' attempts to edit or eliminate the Tribal Cooperating Agencies' alternative position statements in the DEIS.

116.   The Band commented that the FEIS failed to take into consideration direct, indirect, and cumulative impacts to the Band's Treaty rights and resources, which include impacts to, *inter alia*, habitat and wildlife corridors as a result of the Mining Project.  Instead, the Corps concluded, with respect to cumulative effects on cultural resources, that "Band members' use of the NorthMet Mining Project area, and the entire [Cumulative Effects Assessment Area], is not well-defined through research, and did not emerge through interviews."

117.   In these and other ways, the Band identified and commented on deficiencies in the FEIS and PolyMet's application for a 404 permit and urged that further review be done, or at a minimum, if no further NEPA review were to be done, then such deficiencies be addressed and corrected during permitting.

118.   EPA submitted written comments on the FEIS and, among other matters, stated that there remained unresolved issues which EPA expected to be examined and addressed as permits were considered.  In particular, EPA Region 5 deferred resolving EPA's issues related to CWA compliance to the Mining Project's permitting phase.  EPA requested the opportunity to review the Corps' final permit evaluation and 404 Permit, including for indirect and direct wetland impact monitoring, adaptive management, and mitigation plans, in order to assess compliance with the 404(b)(1) Guidelines prior to permit issuance.  On information and belief, EPA Region 5 believed the FEIS would be insufficient to address concerns it had raised regarding the Mining Project's

compliance with the CWA for discharges of pollutants to waters of the United States. On information and belief, EPA's issues deferred to permitting included for example:

    a. Discharges at the Mine Site and Plant Site that occur through hydrologically connected groundwater;

    b. The FEIS's water modeling, including the modeled predictions of travel times for pollutants to reach the Partridge River and unmodeled discharges to waters of the United States closer to the Mine Site;

    c. The need for the Mining Project's NPDES Permit to contain water quality-based effluent limitations necessary to protect water quality standards of the receiving waters, as well as limitations necessary to ensure that downstream water quality standards are protected; and

    d. The transfer of current NPDES permits for the existing tailings basin facilities held by Cliffs Erie.

119. The FEIS stated that the Corps would address issues in its Record of Decision on the 404 Permit only if they had not been addressed in the FEIS.

120. On August 2, 2018, the Band petitioned the Corps to prepare a supplemental EIS given new information released by PolyMet in which PolyMet itself questioned the financial viability of the Mining Project and proposed plans to double or quadruple the scope and size of the Mining Project so that, as expanded, it might be financially viable. PolyMet's proposal for an expanded mining project had not been considered at all in the development of the FEIS. In the Band's petition for a supplemental EIS, the Band provided substantive comments describing the environmental impacts that needed to be evaluated given PolyMet's plans for an expanded Mining Project. The Band's petition highlighted that the FEIS's analyses of environmental impacts was

premised on a mine operation limited to only 32,000 tons per day.  As such, the likely expansion of the Mining Project will drastically change every environmental impact studied in the FEIS, including impacts to the Band's waters and Treaty resources.

121.    Despite the Band's status a cooperating agency, its comments on the deficiencies of the FEIS, and its petition for a supplemental EIS, the Corps did not substantively engage the Band in any of the Corps' further analysis on the issues raised by Band.

### C.  EPA's oversight role for the NPDES Permit and 404 Permit.

122.    On January 21, 2016, shortly after issuance of the FEIS, EPA Region 5 wrote to the Band to recognize the Band's numerous concerns regarding the Mining Project's impacts on the Band's interests.  In that letter, EPA recognized its oversight role with respect to MPCA's NPDES Permit.  EPA also recognized its role in reviewing the Corps' 404 Permit.

### 1.  EPA Region 5 political appointees prevent career staff from placing their concerns in the record regarding the NPDES Permit.

123.    On April 7, 2015, Region 5 career staff emailed Ann Foss, Director of MPCA's Metallic Mining Sector, to document EPA's understanding regarding NPDES permitting for the Mining Project.  In the email, Region 5 career staff referenced a previous request by MPCA to defer water quality issues related to NPDES from the NEPA process to the permitting stage.  The Region 5 career staff stated EPA's position that the FEIS would be insufficient to address EPA's concerns regarding the Mining Project's compliance with the CWA.  The Region 5 career staff's email attached a four-page document discussing EPA's concerns related to NPDES permitting.  In response, Ms. Foss admonished the Region 5 career staff for documenting EPA's understanding and concerns in writing rather than scheduling "conversations."

124.    On July 11, 2016, PolyMet submitted its first application to MPCA for an NPDES permit to authorize discharges of pollutants from the Mining Project.  Less than one month later, on August 2, 2016, MPCA informed PolyMet that its application was complete for processing.

125.    On November 3, 2016, EPA Region 5 sent a letter to MPCA regarding PolyMet's application for an NPDES permit.   In the letter, Region 5 highlighted its Memorandum of Agreement with MPCA that describes the process by which EPA reviews NPDES permit applications that have been submitted to MPCA.  The Memorandum of Agreement provides that, if EPA determines an application is incomplete and identifies deficiencies in a letter, MPCA shall not process the application "until the deficiencies are corrected and it has been advised in writing by the EPA that the NPDES application form is complete."

126.    EPA Region 5's November 3, 2016 letter to MPCA described the deficiencies identified in Region 5's review of PolyMet's application.

127.    On information and belief, Region 5's November 3, 2016 letter was the last written letter from Region 5 that was, in fact, transmitted to MPCA regarding the NPDES Permit.

128.    On February 17, 2017, Scott Pruitt was confirmed to serve as Administrator of EPA.

129.    In December 2017, President Donald J. Trump appointed Defendant Stepp to serve as Regional Administrator for Region 5.

130.    On January 17, 2018, MPCA provided EPA Region 5 with a public notice draft NPDES permit for review.

131.    On information and belief, EPA Region 5 career staff identified numerous significant issues during this review of the draft NPDES permit regarding its compliance with the

CWA and the Mining Project's ability to meet water quality standards.  On information and belief, EPA Region 5 career staff prepared a comment letter to send to MPCA as a result of their concerns.

132.    On information and belief, EPA Region 5 career staff had discussions with MPCA via telephone during this review of the public notice draft NPDES permit.  The substance of some of these discussions have since become known to the public due to MPCA's handwritten notes of the discussions that were released to the public pursuant to requests under the Minnesota Government Data Practices Act (attached as Exhibit B).

133.    MPCA's handwritten notes reflect that a discussion via telephone occurred on March 5, 2018 between EPA Region 5 career staff and MPCA.  During the discussion on March 5, 2018, MPCA's notes reflect that a Region 5 career staff communicated that: "EPA wants to submit comments – make clear what EPA concerns are," and that "EPA will submit comments during [public notice] period."  Ex. B at 2.  MPCA's notes from the March 5, 2018 discussion reflect that EPA "will discuss draft comments" and then references the intention to "set up [a] call early next week," during the week of March 12, 2018.  *Id.*

134.    On March 9, 2018, EPA Region 5 career staff briefed EPA senior management to highlight the significance of the comments identified during the review of the draft NPDES permit and the importance of sharing the comments with MPCA through a comment letter.  *See* Memorandum regarding "Review Summary of Poly Met Mining, Inc., NorthMet Proposed NPDES Permit (MN0071013)" ("December 18 Memorandum"), at 1 n.2 (attached as Exhibit C).  At the briefing, EPA's Water Division recommended sending a comment letter to MPCA during the public comment period to document Region 5's findings.  *Id.*  At the briefing, it was noted that EPA provides comments on draft NPDES permits during the public comment period as part of its regular NPDES program oversight.  *Id.*  It was also noted at the briefing that, at the end of the

Mining Project's NEPA process, EPA agreed with MPCA's proposal to address remaining surface water quality concerns during the permitting process. *Id.* In order to follow-up on the agreement to defer water quality concerns from the NEPA process and to implement EPA's Metallic Mining Joint Priority Agreement with MPCA, it was also noted at the briefing that EPA Region 5 had held biweekly discussions with MPCA on various issues since PolyMet submitted its application for an NPDES permit in July 2016, but numerous concerns remained. *Id.*

135. On information and belief, EPA Region 5 career staff and MPCA had a discussion via telephone on or sometime around March 12, 2018, at which EPA Region 5 career staff discussed comments they had prepared regarding the draft NPDES permit.

136. On information and belief, sometime around March 12, 2018, after EPA Region 5 career staff indicated their intent to submit written comments to MPCA and discussed those comments with MPCA via telephone, MPCA's Commissioner John Linc Stine called or communicated with Defendant Stepp to complain about Region 5's intended comment letter.

137. On March 13, 2018, MPCA's Assistant Commissioner Shannon Lotthammer emailed Kurt Thiede, Defendant Stepp's Chief of Staff at Region 5. *See* American Federation of Government Employees, *EPA union releases leaked email showing apparent malfeasance in PolyMet mine permit process* (June 18, 2019) (attached as Exhibit D). Ms. Lotthammer's email referenced notes "below" from MPCA Commissioner Stine. *Id.* Ms. Lotthammer's email further stated: "We have asked that EPA Region 5 not send a written comment letter during the public comment period." *Id.*

138. On information and belief, sometime in March 2018, Defendant Stepp and/or other political appointees within EPA directed EPA Region 5 career staff not to send the comment letter to MPCA.

139.    On information and belief, in directing Region 5 career staff not to send the comment letter to MPCA, Defendant Stepp and/or other political appointees within EPA acted to suppress the full details of EPA career staff's substantive concerns on the draft NPDES permit, and prevent both transparency and the creation of a public record regarding EPA's concerns.

140.    On March 16, 2018, the Band sent its comments to MPCA on the draft NPDES permit.  In its comments, the Band identified the draft NPDES permit's lack of water quality-based effluent limits, uncontrolled surface and groundwater seepage, inadequate monitoring, MPCA's deficient reasonable potential analysis, and the Mining Project's mercury impacts as deficiencies in the permit that rendered it inconsistent with the CWA.

141.    On March 16, 2018, the public comment period for the draft NPDES permit closed.

142.    On information and belief, after the close of the public comment period, EPA Region 5 career staff had telephone discussions and in-person meetings with MPCA regarding the draft NPDES permit.

143.    On April 5, 2018, during a discussion between EPA Region 5 career staff and MPCA participants via telephone, an EPA career staff read a comment letter on Region 5 letterhead to MPCA participants ("annotated comment letter").  The annotated comment letter was entitled, "U.S. Environmental Protection Agency Review of the Public Notice Draft NPDES Permit, PolyMet Mining, Inc., NorthMet Mining Project, Permit No. MN0071013" (attached as Exhibit E).

144.    The annotated comment letter had underlined, handwritten markings on most of the letter's text and included a signed note at the top, indicating that the underlined text was read word-for-word to MPCA participants during the telephone call on April 5, 2018.  *See id.*

145.    On information and belief, the annotated comment letter reflected the comment letter Region 5 career staff had prepared and intended to send to MPCA during the public notice period on the draft NPDES permit.  The annotated comment letter consisted of detailed technical and legal analysis regarding the draft NPDES permit, including legal and permit citations.  The annotated comment letter stated that the issues identified in the letter "must be addressed to ensure that the permit will achieve compliance with all applicable requirements of the CWA, including water quality requirements of Minnesota and of all affected States."  *Id.* at 2.

146.    On information and belief, the comment letter was never sent to MPCA, but was rather read to MPCA over the telephone on April 5, 2018, as a result of Defendant Stepp and/or other political appointees directing EPA career employees not to send the detailed comment letter.

147.    On information and belief, the direction by Defendant Stepp and/or other political appointees not to send the letter was motivated by political considerations and/or other considerations not relevant under the CWA.

148.    On information and belief, EPA Region 5 career staff would have sent the comment letter to MPCA to document EPA's concerns with the draft NPDES permit, but for the conduct of Defendant Stepp and/or other political appointees at EPA.

149.    On September 25, 2018, EPA career staff met with MPCA and PolyMet to discuss the NPES permit at a face-to-face meeting.  EPA career staff met only with MPCA at a face-to-face meeting the next day on September 26, 2018.  MPCA was required to disclose handwritten notes of these meetings to the public pursuant to requests under the Minnesota Government Data Practices Act (attached as Exhibit F).

150.    MPCA's handwritten notes from the meeting on September 25, 2018 reflect that EPA Region 5 career staff expressed continuing concerns, including that "case law has not shown

EPA can enforce internal operating limit." Ex. F at 3.  The notes further reflect EPA's concern

that the NPDES Permit would serve "as a shield" to protect PolyMet from liability under the CWA.

*Id.* at 2.

151.    MPCA's handwritten notes from the meeting on September 26, 2018 reflect that

EPA was concerned "about peat release" in stormwater from construction of the Mining Project.

*Id.* at 4.  The notes further reflect this concern was related to impacts of mercury in construction

stormwater on downstream water quality, which was referred to as a "401A2 concern."  *Id.*

152.    On November 7, 2018, MPCA emailed its responses to comments received on the

draft NPDES permit to EPA.

153.    On December 4, 2018, MPCA sent EPA a proposed NPDES permit that MPCA

intended to issue to PolyMet.   Under EPA and MPCA's Memorandum of Agreement, this

submission triggered EPA's 15-day review period.  On information and belief, EPA career staff

proceeded to review the proposed NPDES permit.

154.    EPA Region 5 career staff wrote a memorandum to file dated December 18, 2018

entitled, "Review Summary of Poly Met Mining, Inc., NorthMet Proposed NPDES Permit

(MN0071013)" ("December 18 Memorandum").  *See* Ex. C.

155.    On information and belief, the December 18 Memorandum reflects EPA Region 5

career staff's review of MPCA's proposed NPDES permit for PolyMet.

156.    The December 18 Memorandum documents in detail EPA Region 5 career staff's

continued substantive concerns about the lack of water quality-based effluent limits (WQBELs) in

the NPDES Permit, permit enforceability, various pollutants and Mining Project facilities for

which MPCA set no limits, tailings basin seepage, inadequate monitoring, and unregulated

mercury discharges from construction stormwater. These concerns were consistent with those raised in the annotated comment letter.

157. In particular, the December 18 Memorandum emphasizes that the proposed NPDES permit's operating limits are only "<u>arguably</u>" federally enforceable, Ex. C at 5 (emphasis in original), which upon information and belief relates back to EPA's previous concerns about the draft NPDES permit not being legally enforceable and being used as a shield to protect PolyMet from liability under the CWA. The December 18 Memorandum concluded that "the facility has a reasonable potential to exceed [water quality standards] and numeric WQBELs should therefore be included at outfall SD001 to alleviate questions regarding the enforceability of the permit." *Id.*

158. The December 18 Memorandum also memorializes discussions between EPA Region 5 career staff and MPCA, in which MPCA "refused to make any changes to address the expected mercury loading anticipated from stormwater runoff from the removal of peat dominated wetlands and plan to cover this discharge under the State's construction stormwater general permit." *Id.* at 3. The December 18 Memorandum found that the "construction stormwater general permit does not include provisions for addressing specific water quality standards issues." *Id.*

159. The December 18 Memorandum found: "As a result, the proposed permit (and associated permitting scheme) appears to leave mercury from this aspect of the project wholly unregulated." *Id.* The December 18 Memorandum concluded that MPCA's permitting scheme will "not be sufficient to ensure discharges of construction stormwater from peat removal activities, which have been shown to release mercury at other Minnesota industrial facilities, will comply with downstream water quality standards in this case." *Id.*

160. The December 18 Memorandum identifies 29 issues with the proposed NPDES permit. The December 18 Memorandum indicates that MPCA fully resolved only six of those 29

issues as of December 18, 2018.  *See id.* at 5-19.  The December 18 Memorandum also indicates that MPCA completely failed to address nine issues raised by EPA, noting for these issues that EPA's "[c]omment was <u>not</u> addressed."  *See id.* at 11-19 (emphasis in original).

161.   The December 18 Memorandum also documents the March 9, 2018 briefing by EPA Region 5 staff of senior management regarding the significance of the comments identified during EPA's review of the draft NPDES permit and the importance of sharing the comments with MPCA through a comment letter.  *Id.* at 1 n.2.

162.   Two days after the December 18 Memorandum, on December 20, 2018, MPCA issued the NPDES Permit to PolyMet.

163.   On information and belief, the NPDES Permit is substantially the same as the proposed NPDES permit EPA reviewed in the December 18 Memorandum.

164.   On January 22, 2019, the Band filed a petition for certiorari with the Minnesota Court of Appeals for review of the NPDES Permit.  The Band's petition asserted that MPCA failed to ensure the NPDES Permit complied with the CWA and Minnesota law, and that MPCA's decision to issue the NPDES Permit was otherwise arbitrary and capricious.

165.   On January 31, 2019, Jeffry Fowley, a retired attorney for EPA Region 1, submitted a complaint to EPA's Office of Inspector General ("OIG") regarding Defendant Stepp's conduct during the NPDES permitting process for the NorthMet Mining Project.  Letter from Jeffry Fowley, to Kathlene Butler, EPA Office of Inspector General (Jan. 31, 2019) (attached as Exhibit G).  Mr. Fowley alleged, *inter alia*, that, "after she reportedly was called by the State Commissioner, John Linc Stine, who reportedly complained about the planned comments," Defendant Stepp "directed in March, 2018, that the EPA staff not send any written comments to the State."  *Id.* at 2.  Mr. Fowley alleged the existence of the annotated comment letter.  *Id.* at 1.

Mr. Fowley further alleged that Defendant Stepp continued to direct EPA Region 5 career staff not to send written comments to MPCA up to the issuance of the NPDES Permit. *Id.* at 3.

166.    Having been informed of Defendant Stepp's conduct by Mr. Fowley's OIG complaint, the Band submitted its own complaint to the EPA OIG on February 5, 2019.

167.    Following the release of Mr. Fowley's OIG complaint, steps were taken by members of Congress, environmental organizations, and the Band to obtain whatever written records EPA has setting out EPA's comments and concerns on the NPDES Permit.  After five months of efforts, on June 12, 2019, in response to litigation to compel disclosure in *WaterLegacy v. U.S. EPA,* Case No. 19-412 (D.D.C. 2019), EPA released Region 5's written comments, annotated to show what EPA career staff orally shared with MPCA on April 5, 2018. *See* Ex. E.

168.    On June 12, 2019, EPA OIG announced it had opened a full investigation of Region 5's review of the NPDES Permit.

169.    On June 25, 2019, the Minnesota Court of Appeals ordered the pending state certiorari appeals challenging the NPDES Permit to be stayed and transferred to the District Court for the County of Ramsey, based on substantial evidence of procedural irregularities not shown in the administrative record regarding MPCA and EPA's interactions during NPDES permitting. Order, *In re Denial of Contested Case Hearing Requests & Issuance of NPDES/SDS Permit No. MN0071013 for the Proposed Northmet Project St. Louis Cnty. Hoyt Lakes & Babbit Minn.*, Case Nos. A19-0112, A19-0118, A19-0124 (Minn. Ct. App. June 25, 2019) (attached as Exhibit H). The Minnesota Court of Appeals determined there was undisputed evidence that:

a.    MPCA and EPA departed from typical procedures in addressing the NPDES Permit, engaging in multiple telephone conferences and in-person meetings, some of which are not reflected in the administrative record;

44

      b.   EPA prepared written comments on the draft NPDES permit, and those written comments were never submitted to MPCA and are not part of the administrative record;

      c.   EPA instead read the written comments to MPCA during an April 5, 2018 telephone call; and

      d.   MPCA's notes taken during that call were not included in the administrative record and are believed to have been discarded.  *Id.* at 3.

170.    The Minnesota Court of Appeals also found there was disputed evidence regarding whether it was unusual for EPA not to submit written comments; and whether MPCA sought to keep EPA's comments out of the public record.  *Id.* at 3-4.

171.    On July 16, 2019, the December 18 Memorandum became public after it was released by a confidential source to a journalist at the *Star Tribune* newspaper in Minnesota.  The Band first learned of the substance of the December 18 Memorandum on that day.

172.    On August 6, 2019, the Minnesota Court of Appeals issued an order staying the NPDES Permit, at least through the pendency of the transfer proceedings in the Ramsey County District Court.  In its order, the Minnesota Court of Appeals concluded that a stay of the NPDES Permit was warranted, because a substantial issue has been raised regarding the regularity of MPCA's proceedings in granting the NPDES Permit, and because a stay will promote the public interest.

173.    The Ramsey County District Court is to hold an evidentiary hearing and determine the procedural irregularities by the MPCA regarding the NPDES Permit.  The Ramsey County District Court will then issue findings and determinations on the alleged procedural irregularities by MPCA.

174.    EPA and the Corps are not involved in the proceedings before the Minnesota Courts.  The Minnesota Courts have no jurisdiction over EPA's and the Corps' conduct, nor the ability to remedy violations of federal law against EPA and the Corps.

175.    EPA OIG's investigation of Region 5's review of the NPDES Permit is ongoing and it is expected to take some time to conclude.

176.    Based on the actions and inactions of Defendant Stepp and/or political appointees at EPA, the Band was deprived of critical information from the federal agency staff that has the expertise in applying and enforcing the CWA, and which is required to ensure that any NPDES permit that may be issued for the Mining Project contains terms and conditions necessary to protect the waters that will be affected by the Mining Project and on which the Band relies.

177.    Based on the actions and inactions of Defendant Stepp and/or political appointees at EPA, the Band has been deprived of the benefit of EPA's oversight authority in ensuring that the NPDES Permit ensures compliance with the CWA and the Band's water quality standards.

### 2.    EPA fails to provide the Band with the notice and related procedures for affected downstream States and Tribes required by 33 U.S.C. § 1341(a)(2).

178.    In or around March 2017, EPA Region 5 career staff told the Band's water quality staff that they recognized that the Mining Project would not comply with the Band's water quality standards, based on the Band's comments and analysis throughout the NEPA process.  With respect to the Mining Project, Region 5 career staff committed to carrying-out the process for ensuring compliance with the Band's downstream water quality standards under 33 U.S.C. § 1341(a)(2).

179.    On information and belief, EPA Region 5 career staff had concerns that EPA political appointees were attempting to evade EPA's legal obligations regarding the 404 Permit and NPDES Permit.

180.    On information and belief, EPA Region 5 career staff were under heavy pressure from EPA political appointees, who were preventing career staff from carrying out EPA's responsibilities and oversight regarding the 404 Permit and NPDES Permit.

181.    On October 31, 2018, the Band sent a letter to Defendant Stepp, Acting Director Linda Holst of Region 5's Water Division, Regulatory Branch Chief Chad Konickson of the Corps' St. Paul District, and officials at the MDNR and MPCA ("October 31 letter").  The October 31 letter stated that the Band's water quality staff had determined that the Mining Project will affect the Band's waters and result in violations of the Band's downstream water quality standards.  The Band requested it be given notice pursuant to Section 401(a)(2) of the CWA so that the Band could comment on, raise objections to, and/or urge additional measures to ensure that the Mining Project will comply with the Band's downstream water quality standards.  The October 31 letter noted examples of where EPA previously provided notice to other States pursuant to Section 401(a)(2) even when EPA had "made no determination" on whether a project would violate the water quality standards of those downstream States.

182.    On December 20, 2018, MPCA issued its 401 Certification for the NorthMet Mining Project pursuant to Section 401(a)(1) of the CWA, 33 U.S.C. § 1341(a)(1).  In its fact sheet supporting the 401 Certification, MPCA concluded there was "sufficient uncertainty" regarding the Mining Project's effects on downstream water quality in the St. Louis River.  Consequently, MPCA's 401 Certification requires quarterly water quality monitoring.  In addition, MPCA's 401 Certification requires PolyMet to report only to MPCA if monitoring data shows that the Mining Project has caused or contributed to a violation of Minnesota water quality standards in Minnesota regulations.  If PolyMet discovers a violation of Minnesota water quality standards, PolyMet must submit an adaptive management plan to remedy the violation to MPCA for its review and approval.

183.    On December 20, 2018, MPCA sent its 401 Certification to the Corps and PolyMet, with a copy to EPA.

184.    The 401 Certification does not ensure the Mining Project's compliance with the Band's water quality standards.  The 401 Certification does not require monitoring for whether the Mining Project has caused or contributed to a violation of the Band's water quality standards, which in the case of mercury is lower than Minnesota's – and more protective of water quality.  In addition, the 401 Certification's monitoring will not detect relevant mercury increases and changes.

185.    Despite MPCA's conclusion of "significant uncertainty" regarding the Mining Project's effects on downstream water quality, the 401 Certification does not require reporting to the Band if the Mining Project has caused or contributed to a violation of the Band's water quality standards.  Nor does it require PolyMet to report any other information to the Band.

186.    In addition, the 401 Certification does not require PolyMet to obtain the Band's approval for adaptive management to remedy a violation of the Band's water quality standards.

187.    On January 10, 2019, the Band sent a second letter asserting its rights under Section 401(a)(2) to Defendant Stepp, Acting Director Linda Holst of Region 5's Water Division, Regulatory Branch Chief Chad Konickson of the Corps' St. Paul District, and officials at MDNR and MPCA ("January 10 letter").  The Band's January 10 letter asserted again that its water quality staff had determined that the Mining Project would result in a violation of the Band's water quality standards.  The January 10 letter further asserted the right to comment, object, and urge additional measures to ensure the Mining Project will satisfy the Band's water quality standards consistent with the requirements of CWA Section 401(a)(2).

188.    On February 5, 2019, the Band sent a third letter asserting its rights under Section 401(a)(2) to Defendant Stepp, Acting Director Linda Holst of Region 5's Water Division, Regulatory Branch Chief Chad Konickson of the Corps' St. Paul District, and officials at MDNR and MPCA ("February 5 letter").  The Band's February 5 letter objected to the 401 Certification's monitoring requirements and presented expert analysis that contradicted MPCA's analysis of the Mining Project's mercury impacts.  For at least the third time, the February 5 letter asserted the Band's right to comment, object, and urge additional measures to ensure the Mining Project will satisfy the Band's water quality standards.  The February 5 letter described the Band's water quality staff's review of the 401 Certification and Band staff's conclusion that the 401 Certification's monitoring will not detect relevant mercury increases and changes.

189.    EPA never responded to the Band regarding the Band's repeated requests for notice, objections, and requests for a hearing regarding the 404 Permit and 401 Certification as is required by 33 U.S.C. § 1341(a)(2).

190.    EPA never provided the Band with notice as required by 33 U.S.C. § 1341(a)(2).

191.    On information and belief, EPA's decision not to provide notice to the Band was due to undue improper influence by Defendant Stepp and/other political appointees that was based on political and other considerations that are not appropriately considered under the CWA.  On information and belief, EPA purposefully withheld notice to the Band or purposefully prevented notice from issuing to the Band in order to prevent the Band from being heard on its objections to the 404 Permit and 401 Certification.

192.    The Corps failed to respond to the Band's requests for a hearing or hold a hearing on the Band's objections to the 404 Permit and 401 Certification.

**D.  The Corps issues the 404 Permit for the Mining Project.**

193.    On March 21, 2019, the Corps completed its Record of Decision ("ROD") and issued the 404 Permit to PolyMet for the Mining Project.

194.    The 404 Permit authorizes the dredge and fill activities for the purpose of constructing the Mining Project.   PolyMet's dredge and fill activities will directly drain approximately 901 acres of wetlands that are dominated by peat bogs.   These activities will release and discharge significant amounts of mercury and sulfate into downstream waters, affecting the Band's waters.   In addition, over 90% of the wetlands directly destroyed by dredge and fill activities at the Mine Site are high-quality, meaning they have high ecological function and support a high level of biological diversity.

195.    The ROD acknowledges but does not substantively address the Band's repeated requests for notice under Section 401(a)(2) of the CWA, stating only that "[n]o such notice or request for supplemental information was received from EPA."  The ROD fails to disclose that the Band also requested a hearing pursuant to Section 401(a)(2), and that the Corps failed to hold such hearing.

196.    The ROD failed to address the Band's objections to the 404 Permit and 401 Certification that were set forth in the Band's letters dated October 31, 2018, January 10, 2019, and February 5, 2019.

197.    With respect to the Band's Treaty rights and resources, the ROD states that the Mining Project would have "minor adverse impacts" on cultural resources.

198.    Despite GLIFWC's analysis of indirect wetland impacts, including calculating 5,719 acres of severe indirect impacts to wetlands, the ROD notes that the Corps found evaluation of indirect wetland impacts too difficult.  The Corps ignored its own findings in the FEIS that the Mining Project could result in indirect impacts through degradation or destruction of additional

acres of high quality wetlands, and rather used this information "to inform where monitoring should take place."  The Corps developed a "protocol" which requires PolyMet to monitor in locations "having a potential for indirect wetland effects."  The Corps required PolyMet to provide "upfront compensation" to mitigate indirect wetland impacts in the amount of 162 credits from the Lake Superior Wetland Mitigation Bank ("Mitigation Bank").    PolyMet is also required to purchase options to 529 credits in the Mitigation Bank that "may be used" if additional wetlands are lost as a result of indirect impacts.  Once PolyMet exhausts these credits in the Mitigation Bank, PolyMet is not required to mitigate future indirect wetlands impacts by providing for in-kind watershed mitigation.

199.    The ROD erroneously states that the Mining Project complied with the 404(b)(1) Guidelines.

200.    The ROD erroneously states that the Mining Project will not be contrary to the public interest.

201.    The ROD says that the Mining Project's discharges will not cause or contribute to violations of applicable water quality standards.  In addition to other deficiencies, the ROD claims that the Mining Project will not cause any significant water quality impacts, based on the FEIS's water modeling, including the modeling that attempted to show a 90% probability that a pollutant parameter would not exceed water quality "evaluation criteria."  In the context of the FEIS, the Corps determined that the FEIS's "evaluation criteria" was a "reasonable method" of probabilistic modeling for EIS impact assessment, but also recognized it was "not appropriate" to use for determining whether a constituent will exceed actual water quality standards.

202.    The ROD incorporated MPCA's 401 Certification into the 404 Permit and included the 401 Certification as terms and conditions of the 404 Permit.

203.     The ROD notes that the Corps' decision to issue the 404 Permit relied on PolyMet's NPDES Permit issued by MPCA.   The ROD then asserts that the NPDES Permit "contains Operating Limits for sulfate and copper in the permit that are enforceable" and thus "compliance with the Operating Limits will ensure the discharge does not exceed water quality standards for other parameters."   However, in the December 18 Memorandum, EPA career staff did not reach that conclusion, but instead found that the NPDES Permit's operating limits were only "arguably" enforceable and concerns remained about the Mining Project's ability to comply with the CWA and ultimate enforcement of the NPDES Permit.   In addition, the NPDES Permit does not ensure compliance with the Band's water quality standards.

204.     The ROD and the 404 Permit failed to include any permit conditions to ensure the Mining Project will comply with the Band's water quality standards.

205.     The ROD failed to address many substantive deficiencies in the FEIS and PolyMet's 404 permit application that the Band identified.   The ROD relied on, in very substantial respects, the FEIS and therefore the errors contained in the FEIS are carried forwarded in the ROD.

206.     The ROD represents final agency action.   EPA's actions or inactions are now final, because the NPDES Permit and 404 Permit have issued.

## VI.     CAUSES OF ACTION

### First Cause of Action:

### EPA's Failure to Comment On or Object To the NPDES Permit was Improperly Influenced in Violation of the APA

207.     Plaintiff realleges and incorporates by reference the preceding paragraphs as if fully set forth herein.

208.    Under the CWA, EPA exercises oversight authority over State NPDES programs. 33 U.S.C. § 1342(d).  Accordingly, EPA has the authority and responsibility to review, comment upon, or object to a State-issued NPDES permit.  *Id.*

209.    Under the CWA, EPA may object to a State-issued NPDES permit "as being outside the guidelines and requirements" of the CWA*, id.* § 1342(d)(2)(B), as well as if EPA has been notified of recommendations of an affected State "whose waters may be affected by the issuance of a permit," *id.* § 1342(b)(5); *see also id.* § 1342(d)(2)(A).  This includes notification from Indian tribes, like the Band, that have been granted TAS status under the CWA.

210.    Under the CWA, "[n]o permit may be issued . . . [w]hen the conditions of the permit do not provide for compliance with the applicable requirements of CWA, or regulations promulgated under CWA . . . ."  40 C.F.R. § 122.4(a).  The CWA's regulations prohibit the issuance of an NPDES permit "[w]hen the imposition of conditions cannot ensure compliance with the applicable water quality requirements of all affected States . . . ."  *Id.* § 122.4(d).  In addition, "[n]o permit may be issued . . . [t]o a new source or a new discharger, if the discharge from its construction or operation will cause or contribute to the violation of water quality standards."  *Id.* § 122.4(i).

211.    Under the CWA, an NPDES permit "must contain" water quality-based effluent limits for all pollutants or pollutant parameters that "are or may be discharged at a level which will cause, have the reasonable potential to cause, or contribute to an excursion above any State water quality standards . . . ."  *Id.* § 122.44(d)(1)(i), (iii).

212.    Under the CWA, the NPDES Permit at issue in this action is subject to additional procedures in 40 C.F.R. pt. 132, App. F, which provides for special criteria and values for waters within the Great Lakes Basin.

213.    Under the CWA, a permittee may avoid enforcement under a "permit shield" defense for pollutants disclosed during the application process but for which there are no effluent limitations, or for excursions of water quality standards where the limitation in the NPDES permit is greater than the applicable water quality standards.  *See* 33 U.S.C. § 1342(k).

214.    Under the CWA, an NPDES permit must include monitoring requirements "[t]o assure compliance with permit limitations . . . ."  40 C.F.R. § 122.44(i)(1).

215.    Under the CWA, political considerations are not relevant to EPA's decision to comment on an NPDES permit.

216.    Under the CWA, seeking to prevent transparency and avoid the creation of a public record of EPA's concerns and interpretations of the CWA is not relevant to a decision to comment on an NPDES permit.

217.    Under the CWA, political considerations are not relevant to a decision on whether to object to a State-issued NPDES permit.

218.    Under the CWA, seeking to prevent EPA oversight of a State-issued NPDES permit, when career scientists and technical staff have identified significant deficiencies in such permit that remain unresolved, is not relevant to or a lawful basis for a decision by EPA to fail or decline to object to an NPDES permit.

219.    In March 2018, EPA Region 5 career staff prepared a comment letter which was ready to be sent to MPCA for the public record.  The comment letter was particularly detailed, technical, and identified issues regarding the NPDES Permit, including its failure to comply with the CWA, that remain unresolved to this day.

220.    In the December 2018 Memorandum, EPA career staff concluded that "EPA believes the facility has a reasonable potential to exceed [water quality standards] and numeric

WQBELs should therefore be included at outfall SD001 to alleviate questions regarding the enforceability of the permit." Ex. C at 5.  In addition, the December 2018 Memorandum identifies twenty-three out of twenty-nine original issues that remained wholly unresolved as of December 18, 2018.  *Id.* at 5-19.  EPA Region 5 career staff's conclusions in the December 2018 Memorandum, reached two days prior to MPCA's issuance of the NPDES Permit, were consistent with the significant concerns career staff had raised with MPCA throughout 2018.  Political appointees at EPA, including but not limited to Defendant Stepp, knew or should have known that EPA Region 5 career staff's significant concerns remained unresolved as of December 18, 2018.

221.   On information and belief, political appointees at EPA, including but not limited to Defendant Stepp, communicated with officials at MPCA regarding the PolyMet NPDES process. On information and belief, during these conversations, MPCA officials exerted political pressure on the EPA political appointees and urged them not to comment on the draft and/or subsequent versions of the NPDES permit for PolyMet.

222.   On information and belief, in response to political communications, political appointees at EPA, including but not limited to Defendant Stepp, directed and/or unduly influenced Region 5 career staff not to send the comment letter sometime in March 2018.

223.   On information and belief, the purpose of political appointees at EPA, including but not limited to Defendant Stepp, in directing Region 5 career staff not to send the comment letter was to prevent transparency and the creation of a public record of EPA's concerns about the NPDES Permit's failure to comply with the CWA.

224.   Based on EPA's oversight role in administering the NPDES program, EPA's comments are significant in establishing whether an NPDES permit is consistent with the CWA.

225.    On information and belief, EPA relied on political concerns rather than factors mandated by the CWA, which influenced the outcome of EPA's decision not to send written comments on the draft and/or subsequent versions of the NPDES Permit to MPCA for the public record.  EPA's decision was therefore improperly influenced by political concerns, rather than the proper legal and factual considerations required by the CWA.

226.    On information and belief, political appointees at EPA, including but not limited to Defendant Stepp, had communications with PolyMet that were politically motivated and/or improperly influenced EPA's decision not to send written comments on the draft and/or subsequent versions of the NPDES Permit.

227.    By relying on political concerns and improper considerations, EPA entirely abdicated its statutorily-mandated oversight role, instead caving to political pressure including from the very State agency and permittee it is statutorily required to oversee.

228.    On information and belief, EPA relied on factors beyond those made relevant by the CWA, which influenced the outcome of EPA's decision not to object to MPCA's issuance of the NPDES Permit.  EPA's decision was therefore improperly influenced, rather than based on the proper legal and factual considerations required by the CWA.

229.    Therefore, EPA's decision not to submit written comments and/or object to the NPDES Permit was agency action unlawfully withheld or unreasonably delayed; arbitrary and capricious, an abuse of discretion, and otherwise not in accordance with the law.  5 U.S.C. § 706(1), (2)(A).

**Second Cause of Action:**

**EPA's Failure to Review the Proposed NPDES Permit for Discharges Affecting the Band's Waters was in Violation of the CWA and APA**

230.    Plaintiff realleges and incorporates by reference the preceding paragraphs as if fully set forth herein.

231.    For purposes of the CWA, the Band is a State.  *See* 33 U.S.C. § 1377(e).

232.    Under the CWA, EPA must review a State-issued NPDES permit for "[d]ischarges which may affect the waters of a State other than the one in which the discharge originates . . . ." 40 C.F.R. § 123.24(d)(2) ("affected State").

233.    The CWA's regulations prohibit the issuance of an NPDES permit "[w]hen the imposition of conditions cannot ensure compliance with the applicable water quality requirements of all affected States . . . ."  *Id.* § 122.4(d).  In addition, "[n]o permit may be issued . . . [t]o a new source or a new discharger, if the discharge from its construction or operation will cause or contribute to the violation of water quality standards."  *Id.* § 122.4(i).

234.    EPA may object to a State-issued NPDES permit "as being outside the guidelines and requirements" of the CWA, 33 U.S.C. § 1342(d)(2)(B), as well as if EPA has been notified of recommendations of an affected State "whose waters may be affected by the issuance of a permit," *id.* § 1342(b)(5), (d)(2)(A).

235.    In Region 5's March 2018 comments on the draft NPDES Permit, Region 5 stated that "a downstream tribe, that has 'Treatment as a State' and federally approved [water quality standards], has notified EPA that the [mining] project is likely to contribute to exceedances of its downstream [water quality standards], including for mercury."  Ex. E at 3 (Enclosure).  Region 5's March 2018 comments further stated that "MPCA should ensure that its permit will ensure compliance with downstream state [water quality standards]."  *Id.*  On information and belief, EPA Region 5's March 2018 comments referred to the Band and its repeated communications with EPA

regarding the Mining Project's inability to comply with the Band's water quality standards as proposed.

236.    On December 3, 2018, MPCA submitted the proposed NPDES permit to EPA for review.  MPCA's submission of the proposed NPDES permit triggered EPA's fifteen-day review period under the MOA and EPA's duty to review the permit's discharges for effects on the Band's waters and for whether the permit ensured compliance with the Band's water quality standards.

237.    The NPDES Permit issued by MPCA contains "operating limits" on the Mining Project's internal waste stream that are not water quality-based effluent limits enforceable under the CWA.

238.    The NPDES Permit issued by MPCA contains an "operating limit" of 1.3 ng/L total mercury that applies to the WWTS's internal waste stream.

239.    The NPDES Permit issued by MPCA contains an "operating limit" of 10.0 mg/L sulfate that applies to the WWTS's internal waste stream.

240.    The NPDES Permit issued by MPCA does not contain effluent limitations or adequate conditions on discharges of pollutants through seepage of surface water and groundwater.

241.    The Band's water quality standard for mercury is 0.77 ng/L, which applies to waters within the Reservation located downstream of the Mining Project, and is lower than Minnesota's standard for mercury of 1.3 ng/L.

242.    EPA has approved the Band's water quality standards and has the authority to require PolyMet to comply with the Band's more stringent downstream standards.  *E.g.*, *City of Albuquerque v. Browner*, 97 F.3d 415, 424 (10th Cir. 1996).

243.    Waters in the reach of the St. Louis River within the Reservation exceed the Band's water quality standards for mercury.  In addition, fish tissue collected by the Band from

58

Reservation waters has shown mercury concentrations that exceed human health risk levels and has required advisories that recommend Band members limit consumption of traditional preferred fish species.

244.    The Mining Project's discharges have the reasonable potential to cause or contribute to violations of the Band's water quality standards.  *See* 40 C.F.R. § 122.44(d)(1)(i).

245.    On information and belief, EPA failed to conduct a review of the proposed NPDES permit for effects on the Band's downstream waters and for whether the permit ensured compliance with the Band's water quality standards.

246.    EPA's failure to review the NPDES permit for effects on the Band's downstream waters and for whether the permit ensured compliance with Band's water quality standards is also contrary to EPA's trust responsibility to the Band.

247.    Therefore, EPA's failure to review the proposed NPDES permit for effects on the Band's waters was agency action unlawfully withheld or unreasonably delayed; arbitrary and capricious, an abuse of discretion, and otherwise not in accordance with the CWA and its regulations and the APA.  40 C.F.R. § 123.24(d)(2); 5 U.S.C. § 706(1), (2)(A).

### Third Cause of Action:

### EPA's Failure to Issue Notice to the Band for the 404 Permit was Improperly Influenced in Violation of the APA

248.    Plaintiff realleges and incorporates by reference the preceding paragraphs as if fully set forth herein.

249.    For purposes of the CWA, the Band is a State.  33 U.S.C. § 1377(e).

250.    Under the CWA, if the EPA Administrator determines that "a discharge may affect . . . the quality of the waters of any other State," the Administrator "shall so notify such other State."  *Id.* § 1341(a)(2).

251.     Within sixty days, such other State (or "affected State") may notify the Administrator and the licensing agency in writing of its objection to the issuance of the permit and request a public hearing.  *Id.*  If the affected State requests a hearing, the licensing agency "shall hold such a hearing."  *Id.*

252.     Under the CWA, political considerations are not relevant to the Administrator's decision to notify an affected State if a discharge may affect the quality of the waters of that State.

253.     Under the CWA, a purpose of preventing an affected State from being heard on its objections to a permit is not relevant to the Administrator's decision to notify that State if a discharge may affect the quality of its waters and is direct contradiction to the purpose of the notification provision.

254.     Pursuant to 33 U.S.C. § 1341(a)(2), the Band requested notice, objected to the 404 Permit and 401 Certification, and requested a hearing on its objections on October 31, 2018, on January 11, 2019, and on February 5, 2019.  The Band had also notified EPA Region 5 that it expected EPA's notice based on its objections throughout the Mining Project's permitting process. During permitting for the Mining Project, EPA career staff recognized the Mining Project's inability to comply with the Band's water quality standards and committed to the process in 33 U.S.C. § 1341(a)(2).

255.     Under these circumstances, EPA does not have the discretion to choose not to notify an affected State, which includes an Indian Tribe with TAS status.

256.     EPA's failure to provide the Band notice pursuant to 33 U.S.C. § 1341(a)(2) is also contrary to EPA's trust responsibility to the Band.

257.    On information and belief, EPA political appointees, including but not limited to Defendant Stepp, prevented Region 5 career employees from carrying out their mandatory responsibilities under 33 U.S.C. § 1341(a)(2) with respect to the 404 Permit, 401 Certification, and the effects of the Mining Project's discharges on the quality of the Band's waters.

258.    On information and belief, the purpose of the EPA political appointees, including but not limited to Defendant Stepp, in preventing notice from issuing to the Band pursuant to 33 U.S.C. § 1341(a)(2), was to prevent the Band from being heard on its objections to the 404 Permit and 401 Certification with respect to the effects of the Mining Project's discharges on the quality of the Band's waters.

259.    On information and belief, due to political appointees' purpose of preventing the Band from being heard on its objections to the 404 Permit and 401 Certification, EPA relied on factors beyond those relevant under the CWA, which influenced the outcome of EPA's decision. EPA's decision was therefore influenced by improper factors rather than the proper legal and factual considerations required by the CWA.

260.    The effect of EPA's actions and inactions was to deprive the Band of a hearing on its objections to the 404 Permit and 401 Certification pursuant to 33 U.S.C. § 1341(a)(2) and its ability to ensure that any 404 Permit required compliance with the Band's water quality standards.

261.    Therefore, EPA's failure to provide the Band notice was agency action unlawfully withheld or unreasonably delayed; arbitrary and capricious, an abuse of discretion, and otherwise not in accordance with the CWA and APA.  33 U.S.C. § 1341(a)(2); 5 U.S.C. § 706(1), (2)(A).

**Fourth Cause of Action:**

**EPA's Failure to Issue Notice to the Band for the 404 Permit was in Violation of the CWA and APA**

262.     Plaintiff realleges and incorporates by reference the preceding paragraphs as if fully set forth herein.

263.     For purposes of the CWA, the Band is a State.  33 U.S.C. § 1377(e).

264.     Under the CWA, if the EPA Administrator determines that "a discharge may affect . . . the quality of the waters of any other State," the Administrator "shall notify such other State." *Id.* § 1341(a)(2).

265.     Within sixty days, such other State (or "affected State") may notify the Administrator and the licensing agency in writing of its objection to the issuance of the permit and request a public hearing.  *Id.*  If the affected State requests a hearing, the licensing agency "shall hold such a hearing."  *Id.*

266.     Pursuant to 33 U.S.C. § 1341(a)(2), the Band requested notice, objected to the 404 Permit and 401 Certification, and requested a hearing on its objections on October 31, 2018, on January 11, 2019, and on February 5, 2019.  The Band had also notified EPA Region 5 that it expected EPA's notice based on its objections throughout the Mining Project's permitting process.

267.     In the December 18 Memorandum, EPA Region 5 career technical staff concluded that the Mining Project's discharges of mercury from the removal of peat dominated wetlands were "wholly unregulated" and were unlikely to comply with downstream water quality standards.  Ex. C at 3.

268.     The Mining Project's discharges and releases may affect the quality of the Band's waters by releasing mercury from the removal and dewatering of wetlands and as set forth in the Band's three formal requests for notice and a hearing.

269.     Under these circumstances, EPA was required to notify the Band under 33 U.S.C. § 1341(a)(2).

270.     The 404 Permit does not contain conditions that will ensure compliance with the Band's water quality standards.

271.     The 401 Certification does not contain conditions that will ensure compliance with the Band's water quality standards.

272.     Therefore, EPA's failure to provide the Band notice was agency action unlawfully withheld or unreasonably delayed; arbitrary and capricious, an abuse of discretion, and otherwise not in accordance with the CWA and APA.  33 U.S.C. § 1341(a)(2); 5 U.S.C. § 706(1), (2)(A).

**Fifth Cause of Action:**

**The Corps' Analysis of Environmental Effects is Inadequate in Violation of NEPA and the APA**

273.     Plaintiff realleges and incorporates by reference the preceding paragraphs as if fully set forth herein.

274.     Under NEPA, agencies are required to take a hard look at impacts that major federal actions will have on the human environment.  *See, e.g.*, 42 U.S.C. § 4332(2)(C); *Robertson*, 490 U.S. at 352.  NEPA requires, *inter alia*, that an environmental impact statement contain high-quality information and accurate scientific analysis.  40 C.F.R. § 1500.1(b).

275.     The Corps relied on the FEIS in the ROD for the 404 Permit, which constitutes final agency action.

A.  The Corps Failed to Meet Its Obligations to the Band as a Cooperating Agency

276.     As part of the NEPA process, a cooperating agency is an agency other than a lead agency which has "jurisdiction by law or special expertise with respect to any environmental impact involved in a . . . major Federal action significantly affecting the quality of the human environment." *Id.* § 1508.5.  An Indian tribe and a lead agency may agree for the Indian tribe to become a cooperating agency in the NEPA process.  *Id.*

277.     Under NEPA, a lead agency is required to "[u]se the environmental analysis and proposals of cooperating agencies with jurisdiction by law or special expertise, to the maximum extent possible consistent with its responsibility as lead agency." *Id.* § 1501.6(a)(2).

278.     The Corps was a Co-lead agency in preparation of the FEIS for the Mining Project.

279.     The Corps and the Band agreed for the Band to serve as a cooperating agency in preparation of the FEIS for the Mining Project.

280.     The Band has special expertise in water quality for waters within the Reservation located downstream from the Mining Project and with respect to its Treaty rights, including managing resources within the 1854 Ceded Territory.

281.     In its role as a cooperating agency, the Band, assisted by GLIFWC, submitted numerous environmental analyses and proposals to the Corps for use in its environmental review and analysis for the Mining Project.

282.     The Corps failed to use the Band's environmental analysis and proposals to the maximum extent possible.  Instead, as a Co-lead agency, the Corps relied on erroneous and inaccurate data and analysis in reaching its conclusions to support its ROD and issuance of the 404 Permit.  The Band provided and made available to the Corps better and more accurate information and analysis, but the Corps refused to incorporate this information into its analysis.

283.     The Corps failed to incorporate the information and expertise of the Band as required by NEPA.  As a result of the Corps' failure to consider and incorporate the input of the Band with expertise and regulatory authority in relevant areas, the Corps' analysis in both the FEIS and ROD is seriously flawed rendering it inadequate in numerous aspects relevant to the Band. Therefore, the Corps' failure to meet its obligations to the Band as a cooperating agency was

arbitrary and capricious, an abuse of discretion, and otherwise not in accordance with NEPA, CEQ regulations, and the APA.

B.  Arbitrary and Capricious Finding Regarding Environmental Effects

284.    Under NEPA, federal agencies must take a hard look at direct and indirect effects of major federal actions.  *See* 40 C.F.R. § 1508.8.

285.    In November 2015, the Corps issued an FEIS for the Mining Project, which suffers from numerous factual and legal flaws, including issues that were deferred to the permitting stage which have never been addressed.

286.    For example, the FEIS relies on a hydrology modeling program, MODFLOW, that the Corps acknowledged was scientifically flawed.  The FEIS does not disclose the error nor does it have any analysis of environmental impacts to the Rainy River basin due to contaminated groundwater that will flow north after closure of the Mining Project and eventually reach the Boundary Waters Canoe Area Wilderness.

287.    The FEIS erroneously assumed that Mining Project's wastewater treatment facilities would be subject to water quality based effluent limits that are protective of the GLI water quality standard for mercury of 1.3 ng/L.

288.    The FEIS relies on a flawed mass balance estimation to model mercury and other flawed models for hydrology and water quality.

289.    The FEIS does not evaluate the impacts of increased mercury, methylmercury, and sulfate due to the destruction and dewatering of wetlands in the Mining Project area.  These contaminants will flow into the Partridge and Embarrass Rivers, which then flow into the St. Louis River and downstream to the Band's Reservation waters.

290.    The FEIS's conclusion of no mercury impacts downstream in the St. Louis River watershed is not supported by the information presented and is not scientifically defensible. Proper expert analysis shows that the Mining Project is likely to result in significant and long-lasting downstream mercury impacts to aquatic life, wildlife, and human health.

291.    The FEIS arbitrarily compares the Mining Project's predicted water quality against a continuation of existing conditions scenario which excludes future activities that will improve water quality, such as activities mandated by the Cliffs Erie consent decree.

292.    The FEIS does not adequately evaluate or quantitively assess all indirect impacts to wetlands or provide for sufficient mitigation of these impacts to avoid adverse impacts before they occur.

293.    In preparing the FEIS, the Corps and other Co-lead agencies declined to undertake a number of studies that could be done to better determine the potential impacts of the Mining Project, or to correct errors in the data used in the models that were applied. Instead, as set out in the FEIS, the Corps takes the position that the potential adverse impacts can be addressed by "adaptive management" – meaning that after the Mining Project is approved and in operation, monitoring would be done to determine potential adverse impacts, and if such were to occur, then future mitigation measures would be identified, developed, and implemented on an as-needed basis.

294.    The FEIS's use of adaptive management plans is contrary to NEPA, as an adaptive management plan is not a substitute for proper testing before a project is approved when testing and information needed for the analysis can reasonably be obtained prior to completion of the EIS.

295.    The FEIS's use of adaptive management plans is also contrary to NEPA because those plans fail to contain the details necessary to determining when and how the plans will be

applied.  An adaptive management plan, to be effective, should include: clearly defined monitoring and reporting protocols; specific action criteria/triggers; detailed mitigation measures, the effectiveness of which have been evaluated; management requirements and decision tree; identity of technical advisors and decision-makers; and financial assurance for an entire plan, including contingencies.  The "adaptive management plans" in the FEIS, such as those for hydrological characterization of the site, for indirect wetlands impacts, and other potential Mining Project impacts, contain none of these elements.

296.    The ROD relied on, in very substantial respects, the FEIS and therefore the errors contained in the FEIS are carried forwarded in the ROD.

297.    Based on the foregoing and other flaws in the FEIS and ROD, the Corps' evaluation of environmental effects is arbitrary and capricious, an abuse of discretion, not otherwise in accordance with law, and not supported by substantial evidence in violation of NEPA and the APA.  5 U.S.C. § 706(2)(A), (2)(E).

C.   Arbitrary and Capricious Environmental Justice Analysis

298.    Under Executive Order 12,898, "each Federal agency shall make achieving environmental justice part of its mission by identifying and addressing, as appropriate, disproportionately high and adverse human health or environmental effects of its programs, policies, and activities on minority populations and low-income populations in the United States . . . ."  Exec. Order No. 12,898, § 1-101, 59 Fed. Reg. 7629, 7629 (Feb. 16, 1994).

299.    CEQ guidance requires that, as environmentally preferable alternatives are considered in the NEPA process, the disproportionately high and adverse human health or environmental effect on low-income populations, minority populations, or Indian tribes "should be a factor in determining the environmentally preferable alternative."  Council on Envtl. Quality,

Exec. Office of President, *Environmental Justice: Guidance Under the National Environmental Policy Act* 15 (1997), *available at* https://www.epa.gov/sites/production/files/2015-02/documents/ej_guidance_nepa_ceq1297.pdf.   "In weighing this factor, the agency should consider the views it has received from the affected communities, and the magnitude of environmental impacts associated with alternatives that have a less disproportionate and adverse effect on low-income, minority populations, or Indian tribes." *Id.*  Mitigation measures "to avoid, mitigate, minimize, rectify, reduce, or eliminate the impact associated with a proposed agency action . . . should reflect the needs and preferences of affected low-income populations, minority populations, or Indians tribes to the extent practicable." *Id.* at 16.

300.     Under CEQ guidance, disproportionate impacts to an Indian community or other population may occur as a result of that community's special historical, religious, economic, cultural, or other significant connection to the natural environment. *Id.* at 9.

301.     Construction and operation of the Mining Project will have a combined impact on the natural and physical environment that has the potential to significantly and adversely affect the Band.

302.     The adverse cultural, social, economic, and ecological impacts to the Band are interrelated to the adverse impacts to the natural and physical environment that will result from the Mining Project.

303.     The additional environmental effects of the Mining Project will be significant and will have an adverse impact on the Band that appreciably exceed or will likely appreciably exceed the effects on the general population.

304.     The Mining Project is not intended to serve broad public interests or needs.  The Mining Project is an open-pit sulfide mine which is sought by a privately-owned company and

intended, first and foremost, to generate profits for that company.  Although the Mining Project may generate a "small number of jobs" and some tax revenues, those are the only potential benefits which may inure to the public and will likely be negated by the potential adverse environmental impacts of the project that are projected to occur during construction, operation, and indefinite reclamation of the Mining Project.  The FEIS acknowledges that the Mining Project area will remain closed to the public after mine closure.  Under the No Action Alternative, remediation under the existing Cliffs Erie consent decree will reduce mercury and sulfate without the Mining Project.

305.    The FEIS contains no meaningful consideration of the disproportionate impacts that the Mining Project would have on Indian people as is required by Executive Order 12,898.  Contrary to CEQ guidance, the FEIS focuses on a simple recitation of census numbers and proportions of Native Americans in the regional and statewide populations.   The FEIS acknowledges that the Mining Project has the potential to disproportionally affect the Band's rights to hunt, fish, and gather in the area, but the FEIS otherwise ignores those impacts and fails to evaluate the extent of such impacts on the Band and its members.

306.    The Corps also relies on its erroneous and arbitrary analysis of mercury and methylmercury to conclude there is no expected change in fish mercury concentrations, and no subsequent change in human health risks related to fish consumption.

307.    The FEIS dismisses the Band's concerns regarding impacts to subsistence use of Treaty resources such as fish, wild rice and moose.  Instead, the FEIS simply notes that "bioaccumulation of mercury in fish could affect Band members' willingness to rely on subsistence fishing as a contribution to household economies, as well as affect continuation of traditional fishing practices . . . ."  Despite acknowledging this harm, the FEIS evaluates no

alternative that might have a less adverse environmental impact, nor any measure to mitigate the harm.  In these and other ways, the FEIS failed to accurately assess and disclose whether the Mining Project would have a disproportionately adverse effect on minority and low-income populations.

308.    Therefore, the Corps' evaluation of environmental justice impacts and conclusion that the Mining Project would not have a disproportionally high and adverse health or environmental effect on minority populations and low-income populations is arbitrary and capricious, an abuse of discretion, and not otherwise in accordance with NEPA and its implementing regulations, Executive Order 12,898, the CEQ guidance, and the APA.  5 U.S.C. § 706(2)(A).

D.    Failure to Prepare a Supplemental Environmental Impact Statement

309.    An agency "[s]hall" prepare a supplemental EIS if "[t]here are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts."  40 C.F.R. § 1502.9(c)(1); *see also* 33 C.F.R. § 230.13(b).  New information justifies supplementation of an EIS when the information "provides a seriously different picture of the environmental landscape" than that which existed at the time the EIS was drafted.  *Nat'l Comm. for New River v. FERC*, 373 F.3d 1323, 1330 (D.C. Cir. 2004) (quoting *City of Olmsted Falls v. FAA*, 292 F.3d 261, 274 (D.C. Cir. 2002)).

310.    On August 2, 2018, the Band petitioned the Corps for a supplemental EIS for the Mining Project, based on new information publicly released by PolyMet in a report that PolyMet is required to file under Canadian law.  In that report, PolyMet advises that to make the NorthMet Mining Project financially viable and provide an adequate rate of return to its investors, the Project would need to be expanded.  PolyMet proposed to increase the Mining Project's processing rate

so that, rather than processing 32,000 short tons of ore per day ("STPD"), it would increase processing rates to at least 59,000 STPD or 118,000 STPD. The economic analysis in PolyMet's report indicated that to be financially viable, PolyMet must more than triple the Mining Project's daily processing rate, expand the pit mine, and dramatically change the design of its waste processing and storage facilities to handle a huge increase in waste. The Band highlighted how such a major expansion of the Mining Project would likely substantially increase the environmental impacts of the Project, including the waters, wildlife, and other natural resources on which the Band relies to exercise its Treaty rights within both the Reservation and the 1854 Ceded Territory. The FEIS never considered the environmental impacts of a mining operation of the magnitude that PolyMet now proposes, and this new information and its substantially different environmental impacts requires careful evaluation in a supplemental EIS.

311.    In its ROD, the Corps arbitrarily discounted the new information presented in the Band's petition for a supplemental EIS and refused to supplement the EIS. For example, the Corps stated that "it will generally be assumed that appropriate economic evaluations have been completed, the proposal is economically viable, and is needed in the market place," and therefore viewed the possible expansion of the Mining Project to be "speculative." But the Corps' "assumption" is contradicted by PolyMet's own analysis that the Mining Project is not economically viable without a substantial expansion which PolyMet was actively examining for development. In short, PolyMet's report raised "significant new circumstances" and "information relevant to environmental concerns and bearing on the proposed action or its impacts," 40 C.F.R. § 1502.9(c)(1), including cumulative impacts, which required analysis in a supplemental EIS.

312.    Therefore, the Corps' decision not to prepare a supplemental EIS was arbitrary and capricious, an abuse of discretion, and not otherwise in accordance with NEPA and its implementing regulations and the APA.  5 U.S.C. § 706 (2)(A).

**Sixth Cause of Action:**

**The Corps Failed to Properly Evaluate the Mining Project's Impacts on the Band's Treaty Rights Within and Outside the Reservation in Violation of Federal Common Law Governing Treaties with Indian Tribes, NEPA and the APA**

313.    Plaintiff realleges and incorporates by reference the preceding paragraphs as if fully set forth herein.

314.    The Corps correctly recognized that the proposed Mining Project "falls within the territory ceded as part of the 1854 Treaty between the U.S. government and the Chippewa of Lake Superior," including the Fond du Lac Band.  The Corps also correctly found that, under the 1854 Treaty the Chippewa of Lake Superior, including the Fond du Lac Band, retained the rights to hunt and fish (gather or take) natural resources within the 1854 Ceded Territory.  The Corps further correctly found the "Project would have effects on 1854 Treaty resources because the Project area is characterized by areas and species that are traditionally or culturally important to the Bands," and that "[n]atural resources and the lands on which they are gathered are important to the Bands for a number of reasons, including cultural, spiritual, and/or historical meanings."

315.    The Supreme Court has emphasized that, "[i]n carrying out its treaty obligations with the Indian tribes the Government is something more than a mere contracting party. . . .  [I]t has charged itself with moral obligations of the highest responsibility and trust.  Its conduct, as disclosed in the acts of those who represent it in dealings with the Indians, should therefore be judged by the most exacting fiduciary standards." *Seminole Nation*, 316 U.S. at 296-97.  The courts have further found that this standard requires more than mere compliance with statutes, but

72

that the federal government's trust responsibility also constrains agency discretion: "When faced with several policy choices, an administrator is generally allowed to select any reasonable option. Yet this is not the case when acting as a fiduciary for Indian beneficiaries as 'stricter standards apply to federal agencies when administering Indian programs.'" *Cobell v. Norton*, 240 F.3d 1081, 1099 (D.C. Cir. 2001) (quoting *Jicarilla Apache Tribe v. Supron Energy Corp.*, 728 F.2d 1555, 1567 (10th Cir. 1984)). Where the federal agency "is obligated to act as a fiduciary . . . his actions must not merely meet the minimal requirements of administrative law, but must also pass scrutiny under the more stringent standards demanded of a fiduciary." *Jicarilla Apache Tribe*, 728 F.2d at 1563; *see, e.g.*, *Pyramid Lake Paiute Tribe of Indians v. Morton*, 354 F. Supp. 252, 256-57 (D.D.C. 1972).

316.   The Corps, like other federal agencies, has an obligation to protect tribal treaty rights. These obligations are set out in the policies adopted by the Department of Defense and the Corps. U.S. Dep't of Defense, American Indian and Alaska Native Policy (Oct. 20, 1998) *available at* [https://www.denix.osd.mil/na/policy/dod-policies/american-indian-and-alaska-native-policy/](https://www.denix.osd.mil/na/policy/dod-policies/american-indian-and-alaska-native-policy/). The Department of Defense's polices provide, *inter alia*, that the Corps will ensure that it "address[es] tribal concerns regarding protected tribal resources, tribal rights, or Indian lands." *Id.* at 3. The policies further provide that, "[u]nder the federal trust doctrine, the United States – and individual agencies of the federal government – owe a fiduciary duty to Indian tribes" and directs that, "[w]here agency actions may affect Indian lands or off-reservation treaty rights, the trust duty includes a substantive duty to protect these lands and treaty rights 'to the fullest extent possible.'" *Id.* at 3 n.(g). The Corps has applied these policies to deny permits for proposed activities that would have had more than a de minimus interference with such tribal treaty rights. *See, e.g.*, *Nw. Sea Farms,* 931 F. Supp. at 1519-22.

317.    With regard to the Mining Project, however, the Corps gave no practical effect to the matters the Band and other Tribes identified as essential to protecting the Treaty rights and natural resources on which those rights depend.

318.    For example, in the FEIS and the ROD, the Corps limited its review of impacts to the Band's Treaty rights in the 1854 Ceded Territory based on a wrongful and narrow view that it was only required to evaluate "specific information concerning the use of natural resources by the Bands in the [Mining] Project area," and then only if there is "specific information concerning recent-historic subsistence use and . . . information regarding contemporary subsistence activity at the Mine Site, Transportation and Utility Corridor, or Plant Site."

319.    The Corps' narrow formulation applied an improper test as a matter of law and was further contrary to the record.

320.    The Corps in the FEIS and the ROD failed to provide any justification for its flawed and narrow evaluation of the Band's Treaty rights, which runs counter to prevailing law. *See, e.g.*, *Nw. Sea Farms*, 931 F. Supp. at 1519-20 (federal agencies have the duty to consider and protect an Indian tribe's treaty rights in making decisions).

321.    As a result of the Corps' improperly narrow construction, the FEIS and ROD did not fully evaluate the Mining Project's impacts on the Band's Treaty rights in the 1854 Ceded Territory, including for example: the irreplaceable nature of the pristine wetlands at the Mine Site and the impact of the loss of those wetlands – which serve as a vital habitat for a wide variety of natural resources and an important wildlife corridor in a region that has otherwise been the subject of extensive iron ore mining – on the natural resources outside the Project area boundaries; the relationship of activities within the Mining Project area to Treaty resources within the 1854 Ceded Territory; the Mining Project's impact to resources outside the Mining Project area that support

the exercise of the Band's Treaty rights throughout the 1854 Ceded Territory; and that the Mining Project's destruction of 900 acres of pristine wetlands would be permanent and represent lands lost forever to the Band's Treaty rights.

322.    The Corps failed to give heightened consideration to the Band's analysis that showed the Mining Project would impact the Band's Treaty rights and resources.

323.    Based on a flawed evaluation of the Band's Treaty rights, the ROD wrongly stated that a "decrease [of] portions of the 1854 Ceded Territory available for use by the Bands" would have a "negligible" impact on the Treaty rights.  The Corps also failed to consider the cumulative impacts to Treaty resources within the 1854 Ceded Territory, such as impacts to wildlife and habitat corridors and wetland functions.  The Corps gave little weight to the Band's access to fish that can be safely be consumed in the St. Louis River watershed, an essential component of the Band's Treaty rights.  The Corps ignored the Band's management of resources throughout the 1854 Ceded Territory.

324.    In addition to the adverse effect that the loss of habitat on the Mining Project site itself will have on the Band's Treaty rights, the many errors contained in the analysis of the Mining Project's impacts as well as the defects in the NPDES Permit and 401 Certification mean that the Project will have adverse effects on the Band's ability to exercise Treaty-protected rights in a far larger portion of the 1854 Ceded Territory beyond the Mining Project area itself, and adversely affect the Band's on-reservation resources.  The Corps' assumption that the Mining Project's "negative impacts on traditional uses by the Bands, . . . habitat for fish and wildlife and wetlands that provide watershed functions . . . will be minimized through measures to be implemented by the Permittee, through compliance with required state and federal regulations, and by specific

permit conditions  . .  .", is undercut by the errors made in the environmental review including the deficiencies in the NPDES Permit and 401 Certification.

325.    In derogation of its obligations to the Band to protect the Band in its Treaty rights, the Corps also failed to take any action with respect to the Band's repeated objections to the 404 Permit and 401 Certification as insufficient to ensure compliance with the Band's water quality standards that are essential to the protection of the waters and natural resources within the Fond du Lac Reservation.  The Corps unlawfully failed to hold a hearing as requested by the Band on its objections to the 404 Permit and 401 Certification.

326.    Therefore, the Corps' evaluation of the Band's Treaty rights was arbitrary and capricious, an abuse of discretion, and otherwise not in accordance with the federal government's Treaty and trust responsibilities, NEPA, and the APA.  5 U.S.C. § 706(2)(A).

**Seventh Cause of Action:**

**The Corps' Analysis of Cumulative Impacts/Effects is Inadequate in Violation of NEPA, CWA and the APA**

327.    Plaintiff realleges and incorporates by reference the preceding paragraphs as if fully set forth herein.

328.    Under NEPA, agencies must consider cumulative impacts, which are impacts on the environment that result "from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions."  40 C.F.R. § 1508.7.

329.    Under the CWA, the 404(b)(1) Guidelines require the Corps to "determine in writing the potential short-term or long-term effects of a proposed discharge of dredged or fill material on the physical, chemical, and biological components of the aquatic environment" including the "cumulative effects on the aquatic ecosystem."  *Id.* § 230.11(a), (g).  Cumulative

impacts "are the changes in an aquatic ecosystem that are attributable to the collective effect of a number of individual discharges of dredged or fill material." *Id.* § 230.11(g)(1).

330. The Band proposed a scope for cumulative impacts analysis that was appropriate for resources important to the Band and its Treaty rights. The rationale for the Band's proposal was set forth in the Tribal Cooperating Agencies' Cumulative Effects Analysis submitted to the Corps in September 2013. The Corps arbitrarily disregarded the Tribal Cooperating Agencies' Cumulative Effects Analysis in favor of an analysis with an inadequate scope.

331. For example, the Corps disregard the Band's proposal to consider the cumulative effects to land use in and cultural resources of the 1854 Ceded Territory. The FEIS's cumulative effects analysis considered cumulative effects to cultural resources and land use only in the Mesabi Iron Range.

332. In disregard of the Band's proposal to consider the cumulative effects to water resources, wetlands, and aquatic species within the St. Louis River watershed, the FEIS's cumulative effects analysis considered cumulative effects to these resources only in the Partridge and Embarrass Rivers.

333. The FEIS's cumulative effects analysis does not account specifically for impacts to moose, a species of concern that is particularly culturally important to the Band.

334. The FEIS's cumulative effects analysis is also inadequate because it does not consider cumulative effects to the Rainy River Basin resulting from northward flow of groundwater after mine closure. The FEIS does not disclose the error in its hydrology modeling which was identified by the Tribal Cooperating Agencies.

335. The ROD relies on the FEIS's inadequate analysis for determining cumulative effects under the 404(b)(1) Guidelines.

336.    The ROD fails to include or analyze the cumulative effects of PolyMet's plans for an expanded mining project that had not been considered at all in the FEIS.

337.    Therefore, the Corps' cumulative effects analysis in the FEIS and the ROD was arbitrary and capricious, an abuse of discretion, and otherwise not in accordance with NEPA, the CWA and implementing regulations, and the APA.  5 U.S.C. § 706(2)(A).

### Eighth Cause of Action:

### The Corps' Decision to Issue the 404 Permit was Arbitrary and Capricious in violation of the CWA and APA

338.    Plaintiff realleges and incorporates by reference the preceding paragraphs as if fully set forth herein.

339.    The Corps is required, but failed, to comply with the 404(b)(1) Guidelines that govern decisions on whether to issue a permit to allow discharges of dredged and fill materials into the waters of the United States.  40 C.F.R. pt. 230.

340.    Under the 404(b)(1) Guidelines, the Corps is prohibited from issuing a 404 permit "if there is a practicable alternative to the proposed discharge which would have less adverse impact on the aquatic ecosystem, so long as the alternative does not have other significant adverse environmental consequences." *Id.* § 230.10(a).  An alternative is practicable if it is "available and capable of being done after taking into consideration cost, existing technology, and logistics in light of overall project purposes."  *Id.* § 230.10(a)(2).  For example, the Corps did not demonstrate that the Proposed Action is the least environmentally damaging practicable alternative for the Mining Project, including with respect to alternatives such as dry stack tailings and underground mining.

341.    The 404(b)(1) Guidelines prohibit the discharge of dredged or fill material if the discharge "[c]auses or contributes, after consideration of disposal site dilution and dispersion, to

violations of any applicable State water quality standard . . . ." *Id.* § 230.10(b)(1).   For purposes of the 404(b)(1) Guidelines, the Band's water quality standards are an "applicable State water quality standard," because the Band has TAS status and approved water quality standards under the CWA.  *See* 33 U.S.C. §§ 1311(b), 1377(e).

   a. EPA deferred resolution of surface water quality concerns from the FEIS to permitting.  As documented in the December 18 Memorandum, which is consistent with EPA concerns raised throughout permitting, there are numerous issues regarding water quality that were never resolved during permitting nor in the ROD.

   b. The Mining Project's discharges will also cause or contribute to violations of the Band's downstream water quality standards.  The NPDES Permit fails to ensure compliance with the Band's downstream water quality standards.  In addition, the 401 Certification fails to ensure compliance with the Band's downstream water quality standards.  In issuing the 404 Permit, the Corps failed to ensure compliance with the Band's water quality standards by imposing sufficient conditions in the 404 Permit and resolving the Band's objections to the 404 Permit and 401 Certification.  The Corps unlawfully failed to hold a hearing as requested by the Band on its objections to the 404 Permit and 401 Certification.

   c. Therefore, the Corps' finding that the proposed "discharge of dredged and fill material would not . . . [c]ause or contribute to violations of any applicable water quality standards" is arbitrary and capricious and in violation of the CWA and APA. 5 U.S.C. § 706(2)(A).

342.    The 404(b)(1) Guidelines prohibit the discharge of dredged or fill material "which will cause or contribute to significant degradation of the waters of the United States."  40 C.F.R.

§ 230.10(c).  The 404(b)(1) Guidelines set forth adverse effects of the discharge that must be considered individually or collectively.  *See id.* § 230.10(c)(1)-(4).  Adverse effects contributing to significant degradation include, *inter alia*, adverse effects on human health or welfare; life stages of aquatic life and other dependent wildlife; and aquatic ecosystem diversity, productivity, and stability.  *Id.* § 230.10(c)(1)-(3).  In making a determination of whether discharges will "cause or contribute to significant degradation of the waters of the United States," the Corps must consider the direct, secondary, and cumulative effects resulting from issuance of the 404 Permit.  *Id.* § 230.11.  The Corps arbitrarily determined that the Mining Project will not have significant adverse effects on waters of the United States.

    a.  The Mining Project will foreseeably cause the loss of thousands of acres of wetlands, portions of which include the One Hundred Mile Swamp, an interconnected complex of wetlands and forested area designated as an aquatic resource of national significance.  These wetlands rank high in terms of biodiversity and ecosystem function and form the headwaters of major sources of drinking water.  The loss will irrevocably fragment the entire area of connected and contiguous wetland ecosystems, destroying its status as a high-quality wetland and natural area.

    b.  The 404 Permit's direct, secondary, and cumulative effects will have significant adverse effects on human health or welfare, aquatic life and dependent wildlife, and the aquatic ecosystem through, for example, increased methylation of mercury in wetlands, rivers, and streams, increased mercury and sulfate in rivers and streams, and increased fish mercury concentrations.

    c.   The Corps relied on its erroneous and arbitrary analysis related to mercury and sulfate to incorrectly conclude there will be a "net decrease" in overall loadings of mercury and sulfate to the St. Louis River as a result of the Mining Project.

    d.   The Corps arbitrarily ignored the predictable extent of indirect impacts to wetlands without adequate justification.  Instead, the Corps relied on an alternative analysis to determine indirect impacts and allowed for inadequate mitigation, both of which ignored known issues and omitted information that served only to allow for a reduction in overall mitigation that would be required up front.  This approach is also contrary to the Corps' own guidance, which requires wetlands assessment prior to approval of a Section 404 Permit, and fails to minimize anticipated impacts, *inter alia*, by ensuring adequate compensatory habitat will be available.

343.    In addition, the 404(b)(1) Guidelines prohibit the discharge or dredged and fill material "unless appropriate and practicable steps have been taken which will minimize potential adverse impacts of the discharge on the aquatic ecosystem."  *Id.* § 230.10(d).  The Corps "must determine the compensatory mitigation to be required in a [404] permit, based on what is practicable and capable of compensating for aquatic resource functions that will be lost as a result of the permitted activity."  *Id.* § 230.93(a)(1).  In making this determination, the "district engineer must assess the likelihood for ecological success and sustainability, the location of the compensation site relative to the impact site and their significance within the watershed, and the costs of the compensatory mitigation project."  *Id.*

    a.   The Corps did not adequately evaluate or quantitively assess all indirect impacts to wetlands or provide for sufficient mitigation of these impacts to avoid or minimize impacts before they occur.

b.  The Corps did not adequately evaluate or provide measures to minimize impacts from the likely pulse of mercury to the Partridge River that will result from the placement of stripped peat and unsaturated overburden into the unlined Overburden Storage and Laydown Area.

c.  The Corps did not evaluate or provide measures to minimize the impacts of increased mercury, methylmercury, and sulfate due to the destruction and dewatering of wetlands in the Mining Project area.  These pollutants will flow into the Partridge and Embarrass Rivers, which will then flow into the St. Louis River and downstream to the Band's Reservation waters, contaminating aquatic ecosystems.

d.  The Corps failed to provide measures to mitigate or minimize the adverse impacts described in the Band's comments and objections to the 404 Permit and did not ensure compliance with the Band's water quality standards.

e.  The Corps failed to provide measures to minimize impacts to moose, a culturally important species to the Band.

344.  The Corps, in many other respects, relied on the FEIS to reach its decision under the 404(b)(1) Guidelines, and the flaws in the FEIS likewise undermine the Corps' decision regarding the 404 Permit.

345.  For these and other reasons, the Corps did not comply with the 404(b)(1) Guidelines.

346.   Therefore, the Corps' decision to issue the 404 Permit is arbitrary and capricious, an abuse of discretion, otherwise not in accordance with law, and/or contrary to the evidence in violation of the CWA, implementing regulations, and the APA.  5 U.S.C. § 706(2)(A), (2)(E).

**Ninth Cause of Action:**

**The Corps' Evaluation of the 404 Permit Application and Determination of the Public Interest was Arbitrary and Capricious in violation of the CWA and APA**

347.    Plaintiff realleges and incorporates by reference the preceding paragraphs as if fully set forth herein.

348.    The Corps promulgated "general regulatory policies" that govern its evaluation of all applications for a permit from the Department of Army.  33 C.F.R. § 320.4.

349.    The Corps' regulatory policies require the Corps to decide whether to issue a permit "based on an evaluation of the probable impacts, including cumulative impacts, of the proposed activity and its intended use on the public interest." *Id.* § 320.4(a)(1).  For the Corps' determination of the public interest, the Corps is required to consider factors relevant to the proposal, including the cumulative effects thereof, which in this case include: conservation, general environmental concerns, wetlands, historic properties, fish and wildlife values, land use, water quality, considerations of property ownership, and generally the needs and welfare of the people.  *See id.*

350.    The Corps' regulatory policies also define how the Corps is to assess the proposed permitted activity's impacts on water quality, wetlands, fish and wildlife, historic and cultural values associated with Indian religious or cultural sites, land use, and property ownership.  *Id.* § 320.4(b), (c), (d), (e), (g).

351.    With respect to the Corps' evaluation of applicable water quality standards required by 33 C.F.R. § 320.4(d), the Corps states that it evaluated the overall Mining Project, including "all activities in uplands, mining and processing of ore over a 20 year period, restoration and project closure procedures, and mechanical or non-mechanical treatment for as long as necessary . . . ."

a. In finding that there will not be a violation of water quality standards from the Mining Project's discharge of dredge and fill materials into waters of the United States (including wetlands), the Corps unlawfully and arbitrarily ignored the Band's objections to the 404 Permit and 401 Certification. The Corps erroneously relied on and referenced the 401 Certification.

b. The Corps erroneously relied on the NPDES Permit to conclude there would be no significant impacts on water quality from the Mining Project's discharge of pollutants from the waste water treatment facility at the Plant Site. The NPDES Permit does not ensure compliance with the Band's water quality standards.

c. The Corps never considered the potential impacts to water quality in the event that polluted groundwater flows northward after mine closure, an event which "cannot be ruled out."

d. For these and other reasons, the Corps determination that the Mining Project "would have minor adverse effects on water quality" is arbitrary and capricious, an abuse of discretion, and not supported by the evidence. 5 U.S.C. § 706(2)(A), (2)(E).

352. With respect to the Corps' evaluation of cultural values associated with Indian religious or cultural sites required by 33 C.F.R. § 320.4(e), the Corps repeated its erroneous analysis regarding the Band's Treaty rights and resources. The Corps' cumulative impacts analysis also failed to evaluate the full 1854 Ceded Territory. As a result, the Corps made an unsupported, arbitrary, and conclusory statement that the Mining Project "is not likely to significantly reduce overall availability of 1854 Treaty resources that are typically part of subsistence activities in the 1854 Ceded Territory."

353.     With respect to evaluating impacts to wetlands as required by 33 C.F.R. § 320.4(b), the Corps failed to properly delineate and calculate the acreage of indirectly impacted wetlands and erroneously relied on PolyMet's inadequate mitigation for direct and indirect impacts to wetlands to conclude impacts to wetlands would be "minor."

354.     The Corps' evaluation of effects on fish and wildlife required by 33 C.F.R. § 320.4(c) relies on the FEIS's flawed water quality analysis to discount effects on fish.  The Corps also failed to provide measures to mitigate or minimize impacts to moose, a culturally important species to the Band.

355.     With respect to effects on land use required by 33 C.F.R. § 320.4, the Corps said that the Mining Project "would decrease portions of the 1854 Ceded Territory available for use by the Bands," but then found that this was "negligible."  The conclusion that this impact was "negligible" was arbitrary, unsupported, and contrary to the Corps' trust responsibility to the Band.

356.     With respect to consideration of property ownership required by 33 C.F.R. § 320.4(g), the Corps' conclusion that the 404 Permit did not authorize any injury to or invasion of the Band's Treaty rights was arbitrary, unsupported, and contrary to the Corps' trust responsibility to the Band.

357.     With respect to the Corps' evaluation of food supply required by 33 C.F.R. § 320.4, the Corps relied on the FEIS's flawed conclusion that there is no expected change in fish mercury concentrations.  The Corps said bioaccumulation of mercury in fish "could affect" the Band's willingness to rely on fish, a very significant impact on subsistence food supply for the Band and traditional practices.  The Corps placed significant weight on "information showing recent or historic fishing activity in the Project area," which is an arbitrary metric given that fish are not

confined to the waters within the Project area but move freely from the Embarrass and Partridge Rivers to the St. Louis River.

358.    The Corps, in many other respects, relied on the FEIS to reach its decision to approve the application for the 404 Permit, and the flaws in the FEIS likewise undermine the Corps' decision regarding the 404 Permit.

359.    As to these and other factors, the Corps' evaluation of PolyMet's permit application for the 404 Permit was flawed, rendering the Corps' determination of the public interest arbitrary and capricious.

360.    Therefore, the Corps' evaluation of PolyMet's application for a 404 permit and determination of the public interest was arbitrary and capricious, an abuse of discretion, otherwise not in accordance with law, and/or contrary to the evidence in violation of the CWA, implementing regulations, and the APA.  5 U.S.C. § 706(2)(A), (2)(E).

**PRAYER FOR RELIEF**

WHEREFORE, the plaintiff Fond du Lac Band of Lake Superior Chippewa prays that this Court grant it the following relief:

A.  Declare EPA's decision not to submit written comments and/or object to the NPDES Permit prior to issuance to be unlawful in violation of the APA;

B.  Order EPA to reconsider its decision not to object to the NPDES Permit and to base its reconsideration on the proper legal and factual considerations required by the CWA;

C.  Declare EPA's decision not to review the proposed NPDES Permit for effects on the Band's waters to be unlawful in violation of the CWA and the APA;

D.  Order EPA to review the proposed NPDES Permit for effects on the Band's waters and reconsider its decision not to object to the NPDES Permit;

E.  Declare EPA's failure to provide notice to the Band pursuant to 33 U.S.C. § 1341(a)(2) to be unlawful in violation of the CWA and the APA;

F.  Order the Corps to hold a hearing on the Band's objections to the 404 Permit regarding compliance with the Band's water quality standards pursuant to 33 U.S.C. § 1341(a)(2), notwithstanding EPA's failure to provide notice to the Band;

G.  Declare that Department of the Army Permit No. MVP-1999-05528-TJH (the 404 Permit), issued on March 21, 2019 by the St. Paul District of the U.S. Army Corps of Engineers was unlawfully issued in violation of the CWA, NEPA, and the APA;

H.  Set aside the Corps' Record of Decision for the 404 Permit;

I.  Vacate and remand the 404 Permit to the Corps for further action consistent with the Court's rulings;

J.  Grant preliminary and permanent injunctive relief requiring Defendants to order the permit holder to suspend all activities authorized under the 404 Permit;

K.  Award plaintiff its reasonable fees, costs, expenses, and disbursements, including attorneys' fees, associated with this litigation; and

L.  Grant plaintiff such further and additional relief as the Court may deem just and proper.


Respectfully submitted this 10th day of September 2019.


/s/Sean W. Copeland
Sean W. Copeland, (MN #387142)
Tribal Attorney
Fond du Lac Band of Lake Superior Chippewa
1720 Big Lake Road
Cloquet, Minnesota 55720
(218) 878-2632
seancopeland@fdlrez.com

Vanessa L. Ray-Hodge *(Pro Hac Vice Pending)*
Sonosky, Chambers, Sachse,
  Mielke & Brownell, LLP
500 Marquette Avenue NW, Suite 660
Albuquerque, NM 87102
(505) 247-0147
vrayhodge@abqsonosky.com

Matthew L. Murdock *(Pro Hac Vice Pending)*
Sonosky, Chambers, Sachse,
  Endreson & Perry, LLP
1425 K Street NW, Suite 600
Washington, DC 20005
(202) 682-0240
mmurdock@sonosky.com

*Attorneys for Plaintiff Fond du Lac Band of
Lake Superior Chippewa*