UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

FOND DU LAC BAND OF LAKE
SUPERIOR CHIPPEWA,

            Plaintiff,

v.

ANDREW WHEELER, Administrator of
the Environmental Protection Agency;
UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY; SAMUEL L.
CALKINS, District Engineer, St. Paul
District, U.S. Army Corps of Engineers;
RYAN D. McCARTHY, Acting Secretary
of the Army; U.S. ARMY CORPS OF
ENGINEERS; KURT THIEDE, Region 5
Administrator, Environmental Protection
Agency,

            Defendants,

POLY MET MINING, INC.,

            Intervenor Defendant.

Case No. 19-CV-2489 (PJS/LIB)

ORDER

Matthew L. Murdock, SONOSKY, CHAMBERS, SACHSE, ENDRESON &
PERRY, LLP; Vanessa L. Ray-Hodge, SONOSKY, CHAMBERS, SACHSE,
MIELKE & BROWNELL, LLP; Sean W. Copeland, Tribal Attorney, FOND DU
LAC BAND OF LAKE SUPERIOR CHIPPEWA, for plaintiff.

Benjamin J. Grillot and Shaun M. Pettigrew, UNITED STATES DEPARTMENT
OF JUSTICE; David W. Fuller, UNITED STATES ATTORNEY'S OFFICE, for
defendants Andrew Wheeler, United States Environmental Protection Agency,
Samuel L. Calkins, Ryan D. McCarthy, U.S. Army Corps of Engineers, and Kurt
Thiede.

Jay C. Johnson, Kathryn A. Kusske Floyd, and Katherine Sochacki, VENABLE LLP; Monte A. Mills and Davida S. McGhee, GREENE ESPEL PLLP, for intervenor defendant Poly Met Mining, Inc.

Plaintiff Fond du Lac Band of Lake Superior Chippewa ("the Band") brings this action against the Environmental Protection Agency ("EPA"), the U.S. Army Corps of Engineers ("the Corps"), and various agency officials (collectively "the federal defendants"), seeking review of certain agency actions relating to permitting for a proposed mining project.  Poly Met Mining, Inc. ("PolyMet"), the developer of the proposed project, intervened as a defendant.

This matter is before the Court on defendants' motions to dismiss the first four counts of the Band's nine-count amended complaint.  For the reasons that follow, the motions are granted in part and denied in part.  Specifically, the Court grants defendants' motions as to the Band's first cause of action and dismisses that count without prejudice.  The Court also grants in part defendants' motions as to the Band's fourth cause of action and dismisses that count with prejudice insofar as it seeks relief against the Corps.  Defendants' motions are denied in all other respects.

## I.  BACKGROUND

The amended complaint alleges the following, which the Court must accept as true for purposes of ruling on the pending motions:

### A.  The Band

The Band is a federally recognized Indian tribe and member band of the Minnesota Chippewa Tribe.  Am. Compl. ¶ 17.  The Band's reservation is in northeastern Minnesota within the St. Louis River basin.  Am. Compl. ¶ 17.  The Band also retains hunting and fishing rights in land that it ceded under the 1854 Treaty of LaPointe.  Am. Compl. ¶¶ 29–30.

The Band is considered a "State" for purposes of the Clean Water Act.  Am. Compl. ¶ 4; *see* 33 U.S.C. § 1377(e).  In 2001, EPA approved the Band's water-quality standards.  Am. Compl. ¶ 4.  Since then, the Band has implemented a water-quality monitoring and protection program, which has confirmed that reservation waters are meeting the Band's water-quality standards except with respect to mercury.  Am. Compl. ¶¶ 4, 85, 93.  Mercury is of particular concern to the Band, as it accumulates in fish.  Am. Compl. ¶ 4.  Band members rely on fish for subsistence and cultural practices, but fish in the reservation's waters are so high in mercury that they cannot safely be fed to children.  Am. Compl. ¶¶ 4–5.  The Band has also had to issue advisories recommending that Band members limit consumption of traditional fish species.  Am. Compl. ¶ 82.  The primary source of mercury in the fish is waste from existing mines in the vicinity of the proposed mining project.  Am. Compl. ¶ 83.

*B.  The NorthMet Mining Project*

PolyMet's NorthMet mining project would be Minnesota's first copper-nickel-platinum mine.  Am. Compl. ¶ 66.  The mine's proposed location is approximately 70 miles upstream from the Band's reservation and within the territory ceded by the Band in 1854.  Am. Compl. ¶ 66.  The mine site is 3,016 acres and includes approximately 1,311 acres of pristine, high-quality wetlands.  Am. Compl. ¶ 70.  At present, there is no known contamination by hazardous materials at the mine site, which until 2017 was managed as part of the Superior National Forest.  Am. Compl. ¶ 71.

According to the Corps, the project would directly impact over 900 acres of wetlands and indirectly impact nearly 27 more.  Am. Compl. ¶ 72.  The proposed dredge and fill activities would result in the largest permitted destruction of wetlands in Minnesota's history.  Am. Compl. ¶ 73.  The wetlands are dominated by peat bogs, the destruction of which will release significant amounts of mercury and affect the Band's downstream water quality.  Am. Compl. ¶¶ 73, 112, 234.

*C.  Permits*

The Clean Water Act prohibits the discharge of pollutants from a "point source" into "navigable waters" without an appropriate permit.  33 U.S.C. §§ 1311(a), 1362(12). In this lawsuit, the Band challenges EPA's and the Corps's actions with respect to two

such permits issued to PolyMet: (1) a National Pollutant Discharge Elimination System permit ("NPDES permit"), *see* 33 U.S.C. § 1342; and (2) a permit issued under § 404 of the Clean Water Act, 33 U.S.C. § 1344 ("§ 404 permit").

### 1.  NPDES Permit

Under the Clean Water Act, EPA can allow a state to administer its own NPDES permitting program for discharges into navigable waters within its jurisdiction.  33 U.S.C. § 1342(b).  In 1974, EPA granted Minnesota permission to administer such a program, which is run by the Minnesota Pollution Control Agency ("MPCA").  Am. Compl. ¶¶ 42, 45.  A state that administers its own permitting program must enter into a memorandum of agreement with EPA that governs implementation of the program. Am. Compl. ¶ 45; *see* 40 C.F.R. § 123.24(a), (b).  Minnesota's memorandum of agreement provides that, if EPA determines that a permit application is incomplete and identifies the deficiencies to MPCA in writing, MPCA cannot process the application until the deficiencies are corrected and EPA has informed MPCA in writing that the application is complete.  Am. Compl. ¶ 141.

A state-run NPDES program must notify EPA of every application for an NPDES permit that the state receives and every action that the state takes with respect to such an application.  33 U.S.C. § 1342(d)(1).  EPA retains the right to prevent a permit from issuing by objecting in writing that the permit is "outside the guidelines and

requirements" of the Clean Water Act.  *Id.* § 1342(d)(2).  At the same time, EPA has the express authority to waive its right to object.  *Id.* § 1342(d)(3).

EPA Region 5, the regional office responsible for Minnesota and several other states, has a regular practice of identifying certain permits for review each year.  Am. Compl. ¶ 130.  When it selects a permit for review, Region 5's regular practice is to provide written comments during the public-comment period.  Am. Compl. ¶ 132.  Shortly after PolyMet applied to MPCA for an NPDES permit in July 2016, MPCA was informed by EPA that it would review the proposed permit.  Am. Compl. ¶¶ 135–36.

Early in the permitting process, MPCA personnel communicated to EPA that MPCA did not want EPA to submit anything in writing.  Am. Compl. ¶¶ 134, 137.  MPCA also pressured EPA in other ways; for example, MPCA asked EPA to avoid using words like "deficiency" and "significant" in written communications, and MPCA pressured EPA not to submit comments during the public-comment period.  Am. Compl. ¶¶ 139, 148–51, 155.  EPA initially resisted this pressure; in fact, EPA submitted a letter describing deficiencies in PolyMet's application and telling MPCA that Region 5 would review and provide written comments on the draft NPDES permit.  Am. Compl. ¶¶ 138, 140, 142, 144, 149–50.

In December 2017, President Trump appointed Cathy Stepp as regional administrator for Region 5.  Am. Compl. ¶ 145.  Defendant Kurt Thiede became Stepp's

chief of staff. Am. Compl. ¶ 145. MPCA asked Thiede that EPA not submit written comments during the public-comment period. Am. Compl. ¶ 155. Career staff at Region 5 told Thiede that it was standard practice to submit written comments on draft NPDES permits during the public-comment period. Am. Compl. ¶ 156. Although EPA prepared a letter identifying issues with the draft permit, EPA never submitted it. Am. Compl. ¶¶ 158–62. Instead, on March 16, 2018, the last day of the public-comment period, Thiede and MPCA agreed that MPCA would develop a "pre-proposed permit" for EPA's review. Am. Compl. ¶¶ 164–65.

By the end of September 2018, either Thiede or Stepp made clear to Region 5 career personnel that EPA would not object to Polymet's NPDES permit regardless of any scientific, technical, or legal concerns. Am. Compl. ¶ 168. In November, a Region 5 career manager informed the Band that EPA would not be submitting comments on or objecting to the permit. Am. Compl. ¶ 169. Career personnel wrote a memo to the file dated December 18, 2018, documenting unresolved issues in the NPDES permit. Am. Compl. ¶¶ 172–73, 175, 178. Ultimately, EPA did not object to the proposed permit, and MPCA issued the permit to PolyMet on December 20, 2018. Am. Compl. ¶ 180.

The permit authorizes PolyMet to discharge polluted wastewater into creeks that flow into the Embarrass and Partridge Rivers, which are headwaters of and tributaries to the St. Louis River. Am. Compl. ¶¶ 67, 78. As noted, the Band's reservation lies

within the St. Louis River basin.  Am. Compl. ¶ 17.  In addition, the permit subjects the

mine's wastewater-treatment system to internal state operating limits rather than to

water-quality limits under the Clean Water Act.  Am. Compl. ¶ 79.  The permit is

currently under review by the Minnesota Court of Appeals.  Am. Compl. ¶¶ 181, 185,

187; Mills Decl. ¶ 2 & Ex. A (Ramsey County district court's findings of fact, conclusions

of law, and order regarding the permitting process, which returns the matter to the

court of appeals).

### 2.  Section 404 Permit

Permits under § 404 of the Clean Water Act allow the holder to discharge

"dredged or fill material into the navigable waters at specified disposal sites."  33 U.S.C.

§ 1344(a).  The Corps is responsible for issuing § 404 permits.  *Id*. § 1344(a), (d).  As a

prerequisite to obtaining a permit, applicants must obtain "a certification from the State

in which the discharge originates or will originate . . . ."  33 U.S.C. § 1341(a)(1).  The

state certification confirms that any such discharge "will comply" with applicable

provisions of the Clean Water Act.  *Id*.

MPCA issued a § 1341 certification for the mining project on December 20, 2018,

and transmitted a copy to EPA.  Am. Compl. ¶¶ 211–12.  In the fact sheet supporting

the certification, MPCA stated that there was "sufficient uncertainty" regarding the

mining project's effects on downstream water quality in the St. Louis River.  Am. Compl. ¶ 211.

After a state issues a § 1341 certification, the permitting agency must notify EPA of the certification and permit application.  33 U.S.C. § 1341(a)(2).  If EPA determines that the proposed discharge "may affect . . . the quality of the waters of any other State," EPA must notify the affected state within 30 days after EPA received the permit application.  *Id.*  Such notification gives the state certain procedural rights, including the right to object to issuance of the permit and the right to a public hearing on its objection. *Id.*  The permitting agency is then required to "condition such license or permit in such manner as may be necessary to insure compliance with applicable water quality requirements."  *Id.*

As noted, the Band is a "State" for purposes of the Clean Water Act and would therefore be entitled to notice under § 1341(a)(2) in the event that EPA determined that a discharge "may affect" the Band's waters.  In March 2017, a Region 5 career manager told the Band that the mining project would probably not comply with the Band's water-quality standards and the career manager "committed to consultation with the Band" with respect to the § 1341(a)(2) notification process.  Am. Compl. ¶ 199.  Almost a year earlier, Region 5 staff had expressed to MPCA, the Corps, and PolyMet that state

certification would trigger the § 1341(a)(2) process.  Am. Compl. ¶ 193.  Region 5 staff

explained that the "may affect" standard is a "low bar."  Am. Compl. ¶ 193.

In October 2018, seeking to proactively assert its rights, the Band submitted a

written request to EPA for notification under § 1341(a)(2), explaining that the Band's

water-quality staff had determined that the project would violate its water-quality

standards.  Am. Compl. ¶ 206.  A month later—before MPCA issued the § 1341(a)(1)

certification—a Region 5 career manager told the Band that EPA had already decided

not to give the Band § 1341(a)(2) notice.  Am. Compl. ¶ 208.  The Band sent similar

letters requesting § 1341(a)(2) notice on January 10 and February 5, 2019.  Am. Compl.

¶¶ 215, 218.  EPA never gave the Band § 1341(a)(2) notice and never responded to any

of the Band's requests.  Am. Compl. ¶¶ 227–28.  The Corps issued a § 404 permit to

PolyMet on March 21, 2019.  Am. Compl. ¶ 233.

## II.  ANALYSIS

### A.  Standard of Review

Defendants move to dismiss the first four counts of the Band's complaint under

Fed. R. Civ. P. 12(b)(1) for lack of jurisdiction and Fed. R. Civ. P. 12(b)(6) for failure to

state a claim.  Defendants' Rule 12(b)(1) motions present a "facial" attack on this Court's

jurisdiction.  *See Branson Label, Inc. v. City of Branson*, 793 F.3d 910, 914 (8th Cir. 2015)

(distinguishing between a "facial" attack and a "factual" attack).  In analyzing a facial

attack, the Court "restricts itself to the face of the pleadings and the non-moving party receives the same protections as it would defending against a motion brought under Rule 12(b)(6)." *Osborn v. United States*, 918 F.2d 724, 729 n.6 (8th Cir. 1990) (citation omitted).

In reviewing a motion to dismiss for failure to state a claim under Fed. R. Civ. P. 12(b)(6), a court must accept as true all of the factual allegations in the complaint and draw all reasonable inferences in the plaintiff's favor. *Perez v. Does 1–10*, 931 F.3d 641, 646 (8th Cir. 2019). Although the factual allegations need not be detailed, they must be sufficient to "raise a right to relief above the speculative level . . . ." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). The complaint must "state a claim to relief that is plausible on its face." *Id.* at 570.

### B. NPDES Permit

In its first cause of action, the Band challenges EPA's failure to object to the NPDES permit. As noted, the Clean Water Act explicitly grants EPA the authority to waive its right to object to a proposed NPDES permit. *See* 33 U.S.C. § 1342(d)(3). Consequently—and as a number of courts have recognized—EPA's waiver decision is not subject to judicial review under the Administrative Procedure Act ("APA") because it is "committed to agency discretion by law." 5 U.S.C. § 701(a)(2); *see District of Columbia v. Schramm*, 631 F.2d 854, 861 (D.C. Cir. 1980); *see also Menominee Indian Tribe of*

*Wis. v. EPA*, 947 F.3d 1065, 1073 (7th Cir. 2020); *Save the Bay, Inc. v. Adm'r of EPA*, 556

F.2d 1282, 1295 (5th Cir. 1977).

The Band does not really dispute that § 701(a)(2) insulates from judicial review

EPA's ultimate decision to waive its right to object to a proposed NPDES permit.

Instead, the Band insists that it is seeking only a "limited review"—not of the decision

itself, but of the process that EPA used to make the decision.  The Band argues that

EPA's (unreviewable) decision not to object should be overturned because the

(allegedly reviewable) process that EPA used to make that decision unlawfully and

arbitrarily departed from EPA's standard procedures and was influenced by improper

and irrelevant factors.  In support of this distinction, the Band relies almost entirely on

dicta in the 44-year-old decision of the Fifth Circuit in *Save the Bay*.  556 F.2d at 1295–96.

In *Save the Bay*, the Fifth Circuit conceded that EPA's ultimate decision not to

object to an NPDES permit is unreviewable.  *Id.* at 1295.  The court went on to opine,[1]

however, that district courts could review a claim that, in deciding not to object, EPA

either failed to consider the permit's violation of applicable federal pollution-control

---

[1]It is important to note that *Save the Bay*'s entire discussion concerning a district court's jurisdiction to review a decision by EPA about whether to object to an NPDES permit was dicta, as the case did not originate in the district court but rather was filed as an original petition with the Fifth Circuit under 33 U.S.C. § 1369(b)(1).  *Save the Bay*, 556 F.2d at 1292 (stating that "[t]echnically, our obligation is at an end" because "Save the Bay's petition must be dismissed as respects both of its claims," but, for reasons of "judicial economy," going on to consider whether a district court would have jurisdiction to review EPA's decision not to veto an NPDES permit).

guidelines or, alternatively, considered a factor other than the permit's consistency with such guidelines. *Id.* at 1295–96. If the permit violates such guidelines, EPA must either "explain in a manner that cannot be labeled arbitrary how it concluded the violation did not warrant veto" or else reconsider the matter. *Id.* at 1296. Likewise, if EPA considered something other than the permit's compliance with the guidelines, EPA must "explain[] or remove[] the alleged illegitimate factor," after which the final decision not to object would be unreviewable. *Id.*

There are several glaring problems with *Save the Bay*. First, the extended dicta is wholly without any statutory or regulatory basis. Nothing in the statute or relevant regulation governs what EPA may or may not consider in deciding whether to object to an NPDES permit. The relevant statutory language merely states that "[t]he Administrator may, as to any permit application, waive paragraph (2) of this subsection." 33 U.S.C. § 1342(d)(3). Paragraph 2 describes the procedures and bases for *objecting*; in particular, it authorizes EPA to object to a permit "as being outside the guidelines and requirements of this chapter." *Id.* § 1342(d)(2). But it does not require EPA to consider—or preclude EPA from considering—any particular factor when EPA decides whether to *waive* its right to object. Similarly, the relevant regulation describes the bases for making an objection but does not prescribe any standards or procedures

for determining whether to waive objection.[2]  40 C.F.R. § 123.44.  The requirements that

*Save the Bay* imposed on EPA were made up out of whole cloth.

      *Save the Bay* seemingly tries to get around this problem by limiting its dicta to

"the situation in which EPA undertakes consideration of the merits of a proposed

permit and decides on the basis of that consideration not to veto it," leaving for another

day the question whether EPA can simply decline review altogether and thereby

insulate its decision to waive objection from any kind of review.  556 F.2d at 1293 &

n.14.  But this distinction also has no statutory or regulatory basis.  There is no dispute

that EPA has discretion to choose not to object to a permit *even if* the permit fails to

comply with federal regulatory requirements.  *Cf. Menominee Indian Tribe*, 947 F.3d

at 1072 (EPA's decision whether to object to a § 404 permit remains discretionary "no

matter how much a particular permitting proposal may, as an objective matter, deviate

from the prescribed regulatory standards"); *Schramm*, 631 F.2d at 861 (EPA has

discretion to "waive any violations in the permit").  A contrary view would render

_____

      [2]In its amended complaint, the Band cites 40 C.F.R. § 123.24, which governs the memorandum of agreement that a state must enter into with EPA in order to administer a permitting program.  Section 123.24(d)(2) states that, while the memorandum may specify certain "classes or categories" of permits over which EPA will waive its right to review, no waiver may be granted as to certain classes or categories, including "[d]ischarges which may affect the waters of a State other than the one in which the discharge originates[.]"  In other words, this provision prohibits EPA from agreeing with a state to categorically waive review over certain classes of permits  As that is not what happened in this case, § 123.24(d)(2) is not relevant.

§ 1342(d)(3) a practical nullity, as it would do nothing more than give EPA the power to

waive the right to make *baseless* objections—a power that EPA hardly needs.  In short,

there is no legal basis whatsoever for the Fifth Circuit's holding that, in deciding

whether to waive its right to object to a permit that it has chosen to review, EPA cannot

consider anything but the extent to which the permit complies with federal pollution

guidelines.

      Another major problem with *Save the Bay* is that, despite its concession that

EPA's ultimate decision is an unreviewable act of discretion, and despite its

characterization of the scope of permissible review as "limited," the review that it

envisions is virtually indistinguishable from the kind of review that a court would

undertake if it *did* have jurisdiction to review EPA's ultimate decision.  Consider the

scope of the review to which agency decisions are ordinarily subject:

> "An agency decision is arbitrary or capricious if: the agency
> has relied on factors which Congress has not intended it to
> consider, entirely failed to consider an important aspect of
> the problem, offered an explanation for its decision that runs
> counter to the evidence before the agency, or is so
> implausible that it could not be ascribed to a difference in
> view or the product of agency expertise."  *Nat'l Parks
> Conserv. Ass'n v. McCarthy*, 816 F.3d 989, 994 (8th Cir. 2016)
> (quoting *Lion Oil Co. v. EPA*, 792 F.3d 978, 982 (8th Cir.
> 2015)).  "Under this narrow standard, a court is not to
> substitute its judgment for that of the agency, yet the agency
> must examine the relevant data and articulate a satisfactory
> explanation for its action including a rational connection
> between the facts and the choice made."  *Id.*

*Simmons v. Smith*, 888 F.3d 994, 998 (8th Cir. 2018).

Clearly, then, the "limited" review contemplated in *Save the Bay* differs little from the scope of the review to which agency decisions are ordinarily subject. Like ordinary review, *Save the Bay*'s "limited" review involves determining whether EPA failed to consider any necessary factor, whether EPA considered any improper factor, and whether EPA satisfactorily explained its decision not to object. 556 F.3d at 1295–96. It makes no sense to, on the one hand, acknowledge that EPA's decision not to object is not subject to judicial review, but then, on the other hand, subject that "unreviewable" decision to the same type of review to which it would be subject if it *were* reviewable. The dicta in *Save the Bay* in grounded in neither law nor logic.

More importantly for purposes of this lawsuit, the scope of review contemplated by *Save the Bay* is inconsistent with Eighth Circuit precedent. As the Eighth Circuit recently explained, "there is no 'theory of partial reviewability' for actions committed to agency discretion." *Chong Toua Vue v. Barr*, 953 F.3d 1054, 1057 (8th Cir. 2020) (quoting *Schilling v. Rogers*, 363 U.S. 666, 674–75 (1960)); *see also N.D. ex rel. Bd. of Univ. & Sch. Lands v. Yeutter*, 914 F.2d 1031, 1036 (8th Cir. 1990) ("It is self-evident that § 701(a)(2) necessarily deprives a court of jurisdiction to review the sufficiency of the reasons underlying a particular agency action that is committed to the agency's discretion by law."). True, the Eighth Circuit has recognized a limited exception when a litigant

raises a "colorable constitutional claim."  *Tamenut v. Mukasey*, 521 F.3d 1000, 1005 (8th Cir. 2008) (en banc) (per curiam).  But the Band has made no such claim here.

The Band also points to *Story v. Marsh*, 732 F.2d 1375 (8th Cir. 1984), to argue that even though EPA's ultimate decision is unreviewable, its decisionmaking process is subject to review.  The Court doubts that *Story* has survived *Yeutter*, *Tamenut*, and *Chong Toua Vue*.  But even if *Story* remains good law, *Story* does not sanction the type of review that the Band seeks in this case.

Under *Story*, an agency action that is otherwise insulated from review may still be attacked on grounds that "the agency lacked jurisdiction, that the agency's decision was occasioned by impermissible influences, such as fraud or bribery, or that the decision violates a constitutional, statutory or regulatory command."  *Id.* at 1381 (citation and quotation marks omitted).  Here, the Band does not allege that EPA lacked jurisdiction or that it violated any constitutional, statutory, or regulatory command. Instead, it alleges that EPA failed to follow its own standard practices, which do not have the force of law.  While the Band does allege that EPA was influenced by the views of its own political appointees (as well as political appointees of MPCA), that is not the type of improper influence contemplated by *Story*.  *Id.* (listing "fraud or bribery" as examples of the types of "impermissible influences" that would warrant review).

-17-

For these reasons, the Court agrees with defendants that it lacks jurisdiction to review either EPA's decision not to object to the NPDES permit or the process by which EPA made that decision.  Defendants' motion to dismiss the Band's first cause of action is therefore granted.

### C.  § 404 Permit

#### 1.  Failure to Notify under 33 U.S.C. § 1341(a)(2)

In its second and third causes of action, the Band challenges EPA's failure to provide notice to the Band under 33 U.S.C. § 1341(a)(2) as part of the § 404 permitting process.  As noted, under § 1341(a)(2), EPA must notify a state (such as the Band) upon EPA's determination that a discharge from another state (such as Minnesota) "may affect" the quality of the downstream state's waters.  EPA argues that:  (1) it has discretion to decline to make any determination—one way or the other—about whether a discharge "may affect" the waters of any other state; (2) if it *does* make a determination, that determination is wholly committed to EPA's discretion and therefore insulated from judicial review; and (3) even if such a determination *is* subject to judicial review, the Band has failed to plead a plausible claim that EPA abused its discretion.  Like EPA, PolyMet argues that EPA's "may affect" determination is not judicially reviewable and that, even if the determination is reviewable, the Band has

failed to state a claim to compel agency action under 5 U.S.C. § 706(1).  The Court

considers each of these issues in turn.

> *a.  Whether EPA May Decline to Make a "May Affect" Determination*

Defendants concede that, if EPA does in fact determine that a discharge "may

affect" the waters of another state, then EPA is required to notify the affected state

under § 1341(a)(2).  ECF No. 75 at 44–45, 55.  But EPA argues that § 1341(a)(2) does not

require it to actually make a "may affect" determination, and that its decision not to

make such a determination is an exercise of agency discretion that is exempt from

judicial review under 5 U.S.C. § 701(a)(2).

To determine whether a matter is "committed to agency discretion" within the

meaning of § 702(a)(2), courts consider "both the nature of the administrative action at

issue and the language and structure of the statute that supplies the applicable legal

standards for reviewing that action."  *Tamenut*, 521 F.3d at 1003–04 (citation and

quotation marks omitted).  Having considered these factors, the Court concludes that

EPA did not have discretion to decline to make a determination about whether the

discharge authorized by the proposed § 404 permit "may affect" the Band's waters.

This is a difficult issue, and there do not appear to be any judicial decisions

addressing it.  In isolation, the relevant statutory language—directing EPA to provide

notification "[w]henever such a discharge may affect, as determined by the

Administrator, the quality of the waters of any other State"—resembles statutory language in cases in which courts have found that the agency had discretion to choose whether to make a determination or finding.  *See NYPIRG v. Whitman*, 321 F.3d 316, 330–31 (2d Cir. 2003) (the phrase "[w]henever the Administrator makes a determination" left the timing of the determination up to the agency and agency's failure to act was therefore unreviewable under § 701(a)(2)); *Dubois v. Thomas*, 820 F.2d 943, 946–51 (8th Cir. 1987) (statute directing agency to take enforcement action "[w]henever on the basis of any information available to him, the Administrator finds [a violation]" was discretionary and plaintiffs therefore could not sue under the citizen-suit provision of 33 U.S.C. § 1365).

In this Court's view, however, there is an important distinction between the statutory language at issue in those cases and the statutory language at issue in this case.  The "whenever" language that was the focus of cases such as *NYPIRG* and *Dubois* referred to the relevant agency's open-ended, ongoing authority to take various types of enforcement actions.  In that context, it makes sense to interpret such language as discretionary, as it is impossible to pinpoint when a legally enforceable duty to investigate, make findings, or take enforcement action would arise.  *See NYPIRG*, 321 F.3d at 331 n.8 ("The absence of any statutory timelines or procedures for the triggering

-20-

of such a determination also indicates that this determination rests within the EPA's

discretion.").

By contrast, the "whenever" language in § 1341(a)(2) is not describing such open-

ended authority; instead, it refers to a specific decision that must be made within a

specific timeframe.  The process is triggered by an easily identifiable act:  the state in

which the discharge will originate grants a certification to the permit applicant under

§ 1341(a)(1).  Section 1341(a)(2) specifies what happens next:

> Upon receipt of such application and certification the
> licensing or permitting agency shall immediately notify the
> Administrator of such application and certification.
> Whenever such a discharge may affect, as determined by the
> Administrator, the quality of the waters of any other State,
> the Administrator within thirty days of the date of notice of
> application for such Federal license or permit shall so notify
> such other State, the licensing or permitting agency, and the
> applicant.

In the context of the surrounding language, "[w]henever . . . determined by the

Administrator" does not mean that the Administrator can make the determination at

any time; instead, the statute is clear that the Administrator must make the "may affect"

determination within 30 days after receiving notice of the application and certification

from the permitting agency.  The existence of such a clear and limited timeframe

supports the argument that the statute imposes a duty on EPA to make a "may affect"

determination.

More importantly, EPA does not dispute that, under the version of the relevant

regulation in effect at the time, EPA had a legal duty to review—and, in fact, did

review—the PolyMet application and MPCA's § 1341 certification.[3]  *See* 40 C.F.R.

§ 121.13 (2019) ("[t]he Regional Administrator shall review the application, certification,

and any supplemental information provided . . . and if the Regional Administrator

determines there is reason to believe that a discharge may affect the quality of the

waters of any State or States other than the State in which the discharge originates," the

Regional Administrator shall notify that state within thirty days); ECF No. 72 at 8 n.3.

EPA argues that the regulation does not require a particular outcome from that review,

but common sense dictates that the very purpose of the *mandated* review is to facilitate a

*mandated* determination about whether the proposed discharge "may affect" the waters

of another state.  *Cf. Heckler v. Chaney*, 470 U.S. 821, 833 (1985) (a provision stating that

"[t]he Secretary shall investigate such complaint and, if he finds probable cause to

believe that a violation . . . has occurred . . . he shall . . . bring a civil action" is "an

---

[3]This regulation was amended in September 2020 and currently appears at 40
C.F.R. § 121.12(b).  Unlike the regulation that is at issue in this litigation, the new
regulation explicitly grants EPA the discretion to decide whether to make a "may
affect" determination.  *Id.* ("Within 30 days after the Administrator receives notice in
accordance with § 121.12(a), the Administrator at his or her discretion may determine
that the discharge from the certified project may affect water quality in a neighboring
jurisdiction.").  EPA does not mention this amendment nor argue that the Court should
take this version into account in interpreting § 1341(a)(2).  PolyMet mentions the
amendment in a footnote, but does not argue that EPA has the discretion not to make a
"may affect" determination.  *Cf.* ECF No. 72 at 53.

example of statutory language which supplied sufficient standards to rebut the presumption of unreviewability"). It would be an odd indeed if a decisionmaker (such as a judge) was mandated by law to do everything that was necessary to make a particular type of decision (such as the decision whether to grant a preliminary injunction) but was not mandated by law to actually *make* the decision.

The Court's conclusion is bolstered by consideration of the nature and context of the agency action at issue. In *Dubois* and similar cases, the plaintiffs were seeking to force agencies to take enforcement action against alleged violators of laws that the agencies were charged with administering. *Dubois*, 820 F.2d at 944–45 (plaintiffs sought to force EPA to take investigatory and enforcement action against city for allegedly allowing raw sewage to spill into creek); *NYPIRG*, 321 F.3d at 323, 330–31 (petitioner sought to force EPA to issue a notice of deficiency to a state permitting program). These cases relied heavily on *Heckler*, which held that "an agency's decision not to take enforcement action should be presumed immune from judicial review under § 701(a)(2)." 470 U.S. at 832. As *Heckler* explained,

> an agency decision not to enforce often involves a complicated balancing of a number of factors which are peculiarly within its expertise. Thus, the agency must not only assess whether a violation has occurred, but whether agency resources are best spent on this violation or another, whether the agency is likely to succeed if it acts, whether the particular enforcement action requested best fits the agency's overall policies, and, indeed, whether the agency

-23-

> has enough resources to undertake the action at all.  An
> agency generally cannot act against each technical violation
> of the statute it is charged with enforcing.  The agency is far
> better equipped than the courts to deal with the many
> variables involved in the proper ordering of its priorities.

*Id.* at 831–32.

Such concerns are largely absent in this case.  This case does not concern EPA's

general authority to enforce the laws that it is charged with administering and the

consequent need to respect EPA's decisions regarding how best to order its priorities.

Instead, this case involves EPA's duty to make a discrete factual determination

(whether a discharge in one state may affect the quality of the waters in another) within

a specific timeframe (30 days) and based on an application and certification that EPA is

already required to review.  Whether to make a "may affect" determination therefore

does not resemble the type of wide-ranging, multi-factor, policy-oriented

decisionmaking described by *Heckler*.

In addition, the Band is not comparable to a private litigant who seeks to use a

lawsuit to force a federal agency to remedy private harms.  *Cf. Dubois*, 820 F.2d at 949

(noting that the plaintiffs could bring their own lawsuit against the alleged wrongdoers,

indicating that the statute "was not intended to enable citizens to commandeer the

federal enforcement machinery").  As noted, the Band is considered a state for purposes

of § 1341(a)(2) and its federally approved water-quality standards "are part of the

federal law of water pollution control." *Arkansas v. Oklahoma*, 503 U.S. 91, 110 (1992).

Given that the purpose of § 1341(a)(2) appears to be to provide a mechanism to work

out potential interstate conflicts over water pollution, it seems unlikely that, when a

discharge permitted by State A may pollute the waters of State B, Congress intended to

leave State B's § 1341(a)(2) participation rights entirely up to the unreviewable

discretion of EPA. *See* 33 U.S.C. § 1251(b) ("It is the policy of the Congress to recognize,

preserve, and protect the primary responsibilities and rights of States to prevent,

reduce, and eliminate pollution, to plan the development and use (including

restoration, preservation, and enhancement) of land and water resources, and to consult

with the Administrator in the exercise of his authority under this chapter."); *cf. Arkansas*,

503 U.S. at 98 ("Interstate waters have been a font of controversy since the founding of

the Nation.").

　　Finally, it is worth noting that EPA does not argue that its interpretation of

§ 1341(a)(2) is entitled to deference, nor does EPA point to any evidence that, prior to

this lawsuit, the agency ever interpreted § 1341(a)(2) to allow it to decline to make a

"may affect" determination. *See Baouch v. Werner Enters., Inc.*, 908 F.3d 1107, 1117 (8th

Cir. 2018) (agency interpretations that lack the force of law are not entitled to *Chevron*[4]

---

[4]*Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984).

deference, but may be entitled to respect under *Skidmore*[5]); *United States v. Mead Corp.*, 533 U.S. 218, 228 (2001) (*Skidmore* deference depends on "the degree of the agency's care, its consistency, formality, and relative expertness, and to the persuasiveness of the agency's position" (footnotes omitted)).  To the contrary, while there is little evidence either way, clues in the record suggest that, until quite recently, EPA understood § 1341(a)(2) to require it to make a "may affect" determination.  *See* Am. Compl. ¶ 204 (noting that EPA's then-existing guidance indicated that EPA either "finds no potential effects on neighboring states and tribes" or "notifies the states/tribes that may be [a]ffected"); Br. for Resp't & Intervenors, *Hopkins v. Browner*, No. 97-1678 (4th Cir. Sept. 18, 1997), 1997 WL 33575133, at *4 (EPA brief describing procedures under § 1341(a)(2) stating that, upon receiving the permit application and state certification, EPA "must determine" whether the discharge may affect the waters of any other state).

For these reasons, the Court holds that EPA did not have discretion to decline to make a "may affect" determination under § 1341(a)(2).

### b.  Whether EPA's "May Affect" Determination is Reviewable

Defendants next argue that, even if EPA has a duty to make a "may affect" determination, that determination is shielded from judicial review under § 701(a)(2). The Court disagrees.

---

[5]*Skidmore v. Swift & Co.*, 323 U.S. 134 (1944).

"The Administrative Procedure Act embodies a basic presumption of judicial review[.]"  *Dep't of Com. v. New York*, 139 S. Ct. 2551, 2567 (2019) (citation and quotation marks omitted); *see also* 5 U.S.C. § 702 ("A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof.").  Although the Act precludes judicial review when "agency action is committed to agency discretion by law," 5 U.S.C. § 701(a)(2), the Supreme Court has cautioned that this exception is narrow:

> In order to give effect to the command that courts set aside agency action that is an abuse of discretion, and to honor the presumption of judicial review, we have read the § 701(a)(2) exception for action committed to agency discretion "quite narrowly, restricting it to 'those rare circumstances where the relevant statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion.'"  *Weyerhaeuser Co. v. United States Fish and Wildlife Serv.*, 586 U. S. ——, ——, 139 S. Ct. 361, 370, 202 L. Ed. 2d 269 (2018) (quoting *Lincoln v. Vigil*, 508 U.S. 182, 191, 113 S. Ct. 2024, 124 L. Ed. 2d 101 (1993)).  And we have generally limited the exception to "certain categories of administrative decisions that courts traditionally have regarded as 'committed to agency discretion,'" *id.*, at 191, 113 S. Ct. 2024, such as a decision not to institute enforcement proceedings, *Heckler v. Chaney*, 470 U.S. 821, 831–832, 105 S. Ct. 1649, 84 L.Ed.2d 714 (1985), or a decision by an intelligence agency to terminate an employee in the interest of national security, *Webster v. Doe*, 486 U.S. 592, 600–601, 108 S. Ct. 2047, 100 L. Ed. 2d 632 (1988).

*Dep't of Com.*, 139 S. Ct. at 2568 (concluding that decision to add citizenship question to census was subject to review under the APA).

The crucial question is not whether EPA's decision that a discharge may or may not affect the quality of another state's waters involves a degree of discretion. Almost everything that an agency does involves a degree of discretion. *See Weyerhaeuser Co.*, 139 S. Ct. at 370 ("A court could never determine that an agency abused its discretion if all matters committed to agency discretion were unreviewable."). Instead, the crucial question is whether the statute supplies any "meaningful standard against which to judge the agency's exercise of discretion." *Id.* (citation and quotation marks omitted). In this case, the answer is clearly "yes."

The Band argues, and defendants do not dispute, that the "may affect" standard refers to whether the discharge may violate the water-quality standards of another state. This makes sense, as § 1341(a)(2) makes clear that the purpose of providing notice to a downstream state is to permit that state to determine whether the discharge will violate its water-quality standards. *Id.* (stating that "[i]f, within sixty days after receipt of such notification, such other State determines that such discharge will affect the quality of its waters *so as to violate any water quality requirements in such State*," the state may object to the permit and request a hearing (emphasis added)).

Courts have found judicially manageable standards on the basis of far broader language than the type of objective, measurable criteria typically included in state water-quality standards.  *Cf. Dep't of Com.*, 139 S. Ct. at 2568–69 (agency's conduct of the census was judicially reviewable, notwithstanding agency secretary's broad authority to take a census "in such form and content as he may determine," because the Census Act constrains the secretary's authority in various ways, including by embodying "a duty to conduct a census that is accurate and that fairly accounts for the crucial representational rights that depend on the census and the apportionment" (citation omitted)); *Friends of the Norbeck v. U.S. Forest Serv.*, 661 F.3d 969, 975 (8th Cir. 2011) (holding that a statutory provision designating a preserve "for the protection of game animals and birds" and "as a breeding place therefor" provided a workable standard for courts to review the Forest Service's management of the area).

Defendants focus on the phrase "as determined by the Administrator," comparing that language to language in other statutes that courts have found to place an agency's action beyond judicial review.  *See, e.g., Webster v. Doe*, 486 U.S. 592, 594, 601 (1988) (statute granting CIA director authority to terminate an employee "in his discretion . . . whenever he shall deem such termination necessary or advisable in the interests of the United States" precluded judicial review of termination decision); *Yeutter*, 914 F.2d at 1035 (statute prohibiting participation in rental program under

-29-

certain circumstances unless "the Secretary determines that the land was acquired under circumstances that give adequate assurance that such land was not acquired for the purpose of placing it in the program" precluded judicial review of agency's decision not to apply the exception).

Admittedly, there is language in *Webster* that suggests that a statute that conditions agency action on an administrator's subjective judgment categorically insulates that action from judicial review.  *See Webster*, 486 U.S. at 592 ("In allowing termination whenever the Director 'shall *deem* [it] necessary or advisable,' and not simply when the dismissal *is* necessary or advisable, § 102(c) fairly exudes deference to the Director, and forecloses the application of any meaningful judicial standard of review for assessing a termination decision short of permitting cross-examination of the Director.").

But later Supreme Court decisions make clear that a statute that commits a decision to an administrator's subjective judgment does not—in and of itself—render the agency's decision unreviewable.  *See Dep't of Com.*, 139 S. Ct. at 2568 (statute directing secretary to conduct census in "such form and content as he may determine" did not preclude judicial review); *Weyerhaeuser Co.*, 139 S. Ct. at 371–72 (statute stating that secretary "may exclude any area from critical habitat if he determines [the exclusion is beneficial]" did not preclude judicial review); *cf. Massachusetts v. EPA*, 549

U.S. 497, 532–33 (2007) ("While the statute does condition the exercise of EPA's

authority on its formation of a 'judgment,' 42 U.S.C. § 7521(a)(1), that judgment must

relate to whether an air pollutant 'cause[s], or contribute[s] to, air pollution which may

reasonably be anticipated to endanger public health or welfare,' *ibid*.").

The Court therefore finds that it has jurisdiction to review EPA's "may affect"

determination.

### c. Remaining Issues

Defendants make two final arguments concerning the Band's claims that EPA's

failure to notify the Band under § 1341(a)(2) was arbitrary and capricious:  First, EPA

argues that the Band has failed to plead facts sufficient to show that EPA's actions were

improper.  Second, PolyMet argues that the Band has failed to plead the elements

necessary to state a claim to compel agency action.  Both of these arguments are without

merit.

With respect to EPA's argument:  Given that the Court has held that EPA had a

legal duty to make a "may affect" decision—and given that EPA has admitted that it

did not make such a decision—the Band would seem to have a plausible (perhaps even

a slam-dunk) claim that EPA did not act "in accordance with law."  5 U.S.C. § 706(2)(A).

The Band alleges that EPA based its decision on improper factors and that the Band's

own analysis shows that the proposed discharge satisfies the "may affect" standard.

Under the circumstances, this is sufficient to state a plausible claim that EPA abused its

discretion or otherwise acted contrary to law when it decided not to notify the Band

under § 1341(a)(2). *Cf. Simmons*, 888 F.3d at 998 (agency action is arbitrary or capricious

if the agency "entirely failed to consider an important aspect of the problem" (citation

and quotation marks omitted)).[6]

      With respect to PolyMet's argument:  The Band asserts claims under 5 U.S.C.

§ 706(2), which, among other things, empowers courts to set aside agency action that is

"arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with

law[.]"  PolyMet argues that, in reality, the Band is challenging EPA's "failure to act,"

5 U.S.C. § 551(13), and that therefore the Band's claims arise under 5 U.S.C. § 706(1),

which empowers courts to "compel agency action unlawfully withheld or unreasonably

delayed[.]"  To state a claim under § 706(1), a plaintiff must identify a "*discrete* agency

action that [the agency] is *required to take*."  *Norton v. S. Utah Wilderness All.*, 542 U.S. 55,

64 (2004).  PolyMet argues that, because EPA's "may affect" determination is

---

[6]EPA argues that certain allegations, such as the Band's allegations that EPA treated it dissimilarly and that EPA failed to follow its own procedures on tribal consultation, are either insufficiently pleaded or legally irrelevant.  As the Band has adequately pleaded a basic claim that EPA abused its discretion in deciding not to notify the Band under § 1341(a)(2), the Court need not further address the issue of plausibility.  The Court can address the legal relevance of various factors at a later time, when it has the benefit of a full record.

discretionary, the Band cannot plausibly plead that EPA was required to notify it under § 1341(a)(2).

This argument misconstrues the nature of the Band's claims.  The Band does not contend that EPA was required to notify it under § 1342(a)(2)—period.  In other words, the Band does not claim that EPA was required to notify it *regardless* of the outcome of EPA's "may affect" determination.  Instead, the Band alleges that EPA's failure to find that the particular proposed discharge "may affect" the quality of the Band's waters was arbitrary, capricious, and an abuse of discretion.

Thus, the Band's claim is not akin to a claim that an agency failed to implement broad-based policies—the kind of claim at issue in *Norton* and other cases PolyMet cites. Here, the Court has found that EPA was required to decide within 30 days whether to give notice to the Band under § 1341(a)(2) and that deadline has passed, meaning that EPA has necessarily made a decision not to notify the Band.  There can be no doubt that this decision constituted "final agency action" within the meaning of 5 U.S.C. § 704, as it deprived the Band of rights it otherwise would have had under § 1341(a)(2).  *See Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (to be final, agency action "must mark the consummation of the agency's decisionmaking process" and "must be one by which rights or obligations have been determined, or from which legal consequences will flow" (citations and quotation marks omitted)).  As such, EPA's failure to notify more

-33-

closely resembles a "denial" rather than a "failure to act."  *See* 5 U.S.C. § 551(13)

("'agency action' includes the whole or a part of an agency rule, order, license, sanction,

relief, *or the equivalent or denial thereof*, or failure to act" (emphasis added)); *id*. § 551(6)

(defining "order" to mean "the whole or a part of a final disposition, whether

affirmative [or] negative . . . of an agency in a matter other than rule making but

including licensing").  The Band's allegations therefore fit comfortably within the

sphere of § 706(2) claims.[7]

### 2.  Failure to Notify under 5 U.S.C. § 555(e)

Finally, in its fourth cause of action, the Band alleges that the federal defendants

violated 5 U.S.C. § 555(e) by failing to respond to the Band's requests for notice and a

hearing under § 1341(a)(2).  Section 555(e) states as follows:

> Prompt notice shall be given of the denial in whole or in part
> of a written application, petition, or other request of an
> interested person made in connection with any agency
> proceeding.  Except in affirming a prior denial or when the

--------

[7]Alternatively, even if PolyMet is correct that (1) the real nature of the Band's claims is a challenge to EPA's "failure to act" and (2) such a challenge may be brought only under § 706(1), the allegations in the amended complaint are sufficient to support such a claim.  Specifically, the facts alleged in the amended complaint are sufficient to support a claim to compel EPA to decide whether the proposed discharge "may affect" the quality of the Band's waters, as that is a discrete agency action that the Court has found EPA is required to take.  *See Norton*, 542 U.S. at 65 ("when an agency is compelled by law to act within a certain time period, but the manner of its action is left to the agency's discretion, a court can compel the agency to act," although the court "has no power to specify what the action must be").

denial is self-explanatory, the notice shall be accompanied
by a brief statement of the grounds for denial.

The purpose of § 555(e) "is to allow a reviewing court to assess the agency's decision."

*High Country Citizens All. v. Clarke*, 454 F.3d 1177, 1192 (10th Cir. 2006).  Section 555(e)

does not provide any substantive rights; in other words, it does not give the Band the

right to notice and a hearing under § 1341(a)(2).  Rather, it provides a procedural right;

it gives the Band the right to an *explanation* of why its request for notice and a hearing

was denied.

PolyMet argues that the Band cannot pursue a claim under § 555(e) because the

underlying action about which it complains—the decision not to issue a § 1341(a)(2)

notification—is not subject to judicial review.  *See High Country Citizens All.*, 454 F.3d

at 1192.  But given that the Court has found that the decision not to issue a § 1341(a)(2)

notification is reviewable, the premise of PolyMet's argument is mistaken, and its

argument fails.

For their part, the federal defendants first argue that the Band is not an

"interested person."  "The APA does not define the term 'interested person.'"  *Animal*

*Legal Def. Fund, Inc. v. Vilsack*, 237 F. Supp. 3d 15, 21 (D.D.C. 2017).  At a minimum,

however, a litigant with standing to seek judicial review of an agency action appears to

qualify as a "interested person."  *See Nichols v. Bd. of Trs. of Asbestos Workers Local 24*

*Pension Plan*, 835 F.2d 881, 896 (D.C. Cir. 1987) (holding that plan beneficiary, who

-35-

challenged IRS decision to approve a retroactive reduction in vested plan benefits, qualified as an "interested person" for purposes of § 555(b)).  The Band clearly has standing to seek judicial review of EPA's decision not to give the Band notice under § 1341(a)(2).

Next, the federal defendants argue that the Band's written request was not "made in connection with an agency proceeding."  This argument appears to rest on the contention that the relevant "agency proceeding" is EPA's process of making a "may affect" determination.  Because § 1341(a)(2) does not provide for any public input concerning EPA's "may affect" determination, the federal defendants argue, it does not qualify as an "agency proceeding."

This reasoning may be sound on its own terms, but it misconstrues the Band's § 555(e) claim.  According to the amended complaint, the Band did not request the right to participate in the process by which EPA reached its "may affect" decision.  Instead, the Band requested that it receive notice under § 1341(a)(2) so that it could formally participate in the *permitting process*—that is, the process that *followed* the "may affect" decision.  That permitting process is unquestionably an "agency proceeding."  *See* 5 U.S.C. § 551(12) (defining "agency proceeding" to include "an agency process as defined by paragraphs (5), (7), and (9) of this section"); *id.* § 551(9) ("'licensing' includes agency process respecting the grant, renewal, denial, revocation, suspension,

annulment, withdrawal, limitation, amendment, modification, or conditioning of a

license"); *id.* § 551(8) ("'license' includes the whole or a part of an agency permit . . . or

other form of permission").

In sum, then, the Band, which is an "interested person," made "written . . .

request[s] . . . in connection with [an] agency proceeding."  The fact that EPA's "may

affect" determination is discretionary and involves no formal proceedings is irrelevant.

*See Roelofs v. Sec. of Air Force*, 628 F.2d 594, 600 (D.C. Cir. 1980) (section 555(e) applies

"even though the request pertains to a matter of discretion or grace" and "even where

there is no formal proceeding or hearing").  Nor is it necessary that the Band have a

separate statutory right to participate.  *Id.* ("§ 555 is not limited to cases where a specific

statutory prescription exists, but applies 'according to the provisions thereof'" (quoting

§ 555(a))).  The Band's requests appear to fit squarely within the ambit of § 555(e), and

therefore the Court denies defendants' motions to dismiss the Band's § 555(e) claim as

against EPA and its officials.[8]

The Court agrees with defendants, however, that the Band's § 555(e) claim

against the Corps must be dismissed.  Section 555(e) requires prompt notice of the

"denial" of a written request.  The Corps does not have the authority to deny a request

---

[8]The Court notes that the defendant officials are sued in their official capacities
only, Am. Compl. ¶¶ 18–19, 22–23, and therefore claims against them simply replicate
the claims against the defendant agencies, *see Kentucky v. Graham*, 473 U.S. 159, 165
(1985).

for notification under § 1341(a)(2), however, and the Corps obviously has no obligation

to explain why EPA denied the Band's request for such notification.  The Court

therefore grants defendants' motions to dismiss the Band's § 555(e) claim as against the

Corps and its officials.

ORDER

Based on the foregoing, and on all of the files, records, and proceedings herein,

IT IS HEREBY ORDERED THAT:

1.  Defendants' motions for partial dismissal [ECF Nos. 56, 61] are

     GRANTED IN PART and DENIED IN PART.

2.  The motions are GRANTED as to the First Cause of Action in plaintiff's

     amended complaint [ECF No. 51], and that claim is DISMISSED

     WITHOUT PREJUDICE for lack of jurisdiction.

3.  The motions are GRANTED as to the Fourth Cause of Action in plaintiff's

     amended complaint insofar as that claim is asserted against defendants

     U.S. Army Corps of Engineers, Samuel L. Calkins, Ryan D. McCarthy, and

     their successors under Fed. R. Civ. P. 25(d), and that claim is DISMISSED

     WITH PREJUDICE AND ON THE MERITS.

4.  The motions are DENIED in all other respects.

Dated:  February 16, 2021                    s/Patrick J. Schiltz
                                             Patrick J. Schiltz
                                             United States District Judge